In the Matter of the Petition of OTTO BRAND to Prove the Last Will and Testament of SOPHIA MORISON, Late of the County of Sullivan, Deceased.

OTTO BRAND, Appellant; HARRY G. MORISON and ANTOINETTE FRASER, Respondents.

Third Department, November 22, 1918.

Will — probate — trial of issues as to validity of testamentary instrument — appeal — failure to object to erroneous charge — when error available — question of law — whether will drawn in compliance with statute — testamentary· capacity — undue influence — relationship between minister and testatrix — when former not bound to establish that he did not influence making of bequest in his favor — findings of insanity of testatrix and close and confidential relationship with legatee inconsistent — right of friend to present claims for preferment in final disposition of estate — memory of romance does not indicate insanity.

If the provisions of section 10 of the Decedent Estate Law that "All persons, except idiots, persons of unsound mind and infants, may devise their real estate, by a last will and testament, duly executed, according to the provisions of this article," are to have any substantial value, and this right is to be preserved, it is important that the issues should be tried patiently, intelligently and honestly, whenever the validity of a testamentary instrument is brought in question.

The proponents of a will are not precluded from reviewing the questions of law involved by the fact that there were no exceptions to the erroneous charge of the trial court where they moved for a new trial upon the grounds stated in section 999 of the Code of Civil Procedure.

Whether a will was drawn in the form prescribed by statute is a pure question of law.

A testatrix died at the age of fifty-two years leaving an estate of approximately $15,000, which, after various individual gifts, including $1,000 to a Methodist church and another $1,000 to a hospital where she received treatment, and gifts of $100 each to a brother and sister and of $500 to the only daughter of the sister, she having had litigation with said brother and sister, she gave her residuary·estate to a Methodist minister. On the probate of the will the contestants sought to show that said minister, who was not her pastor at the time and could not be regarded as her spiritual adviser, had unduly influenced her to make the provision in his favor. It was also sought to be shown that the testatrix was of unsound mind and that the will was not properly executed. It appeared that said minister had been the pastor of the church attended by the parents of the testatrix and had been a friend of the family, which friendship had

continued, but there was no evidence that said minister and testatrix were together at the time the will was executed.

*Held*, that the verdict of the jury denying probate is inconsistent, is against the evidence and the weight of the evidence, contrary to law, and should not be allowed to stand;

That it was reversible error to so instruct the jury as to lead them to understand that said minister and testatrix were both at the hospital at the immediate time of the making of the will and also since the residuary legatee was a minister and had known the testatrix for a long period of years he was bound to establish that he did not influence her in making the will.

A minister merely because of his profession, where he is not shown to be the spiritual adviser of a testatrix, is not bound to establish that he did not influence her in making a bequest in his favor.

A finding by the jury that the testatrix was of unsound mind and incapable of making a will is inconsistent with the finding that there was " a close and confidential " relationship between her and the said minister.

The law does not forbid a friend from presenting his claims for preferment in the final disposition of an estate where he has performed kindly offices.

The memory of an old romance cherished through the years does not necessarily indicate insanity.

LYON and COCHRANE, JJ., dissented, with opinion.

APPEAL by the petitioner, Otto Brand, from a decree of the Surrogate's Court of the county of Sullivan, entered in the office of said Surrogate's Court on the 29th day of October, 1917, denying probate to an instrument propounded as and for the last will and testament of Sophia Morison, deceased, after a trial had been had in the Supreme Court before a jury.

*Henry A. Ingraham*, for the appellant.

*George L. Cooke*, of counsel, for Brooklyn M. E. Hospital.

*John D. Lyons* [*Joseph Rosch*, of counsel], for the respondents.

WOODWARD, J.:

Section 10 of the Decedent Estate Law (Consol. Laws, chap. 13; Laws of 1909, chap. 18), in harmony with section 15 of the same act, provides that " All persons, except idiots, persons of unsound mind and infants, may devise their real estate, by a last will and testament, duly executed, according to the provisions of this article," and if the statutory provisions are to have any substantial value, and this right is to be preserved, it is important that the issues should be tried

patiently, intelligently and honestly, whenever the validity of a testamentary instrument is brought in question.

A careful reading of this record convinces me that the will of Sophia Morison should have been admitted to probate; that there was no evidence, entitled to consideration, which could justify the answers to the four questions propounded, and that the court erred in its charge to the jury. While there was no exception to the charge, the proponents did, on the coming in of the verdict, move for a new trial upon the grounds stated in section 999 of the Code of Civil Procedure, and the question is still open to them. (*Lesin* v. *Shapiro*, 147 App. Div. 100, 104.) The nature of the case, the scope of the evidence, running through the entire life of Sophia Morison, who died at the age of fifty-two years, makes any error in the charge of the court of great importance, and it seems fitting, before entering upon a discussion of the trifling character of the evidence, and the distortions to which it has been subjected, to call attention to the attitude of the learned trial court, as evidenced by the charge to the jury. It is perhaps well to state, at this point, that there is no question raised that the will in question was executed in the form required by the Decedent Estate Law (§ 21), although the jury found to the contrary, practically upon the instruction of the court that all of the first three questions must be answered in the same manner, on the theory that if the testatrix was of unsound mind, or if the will was the result of undue influence, it could not have been legally executed, no matter what its form. This, of course, might be true as a matter of law, but the question fairly contemplated whether the will was drawn in the form prescribed by law, and, if it was, this was one of the conditions precedent to a valid will, and should be recognized as such. (Decedent Estate Law, § 10.) Such a question ought not to have been submitted to the jury in any event; it was a pure question of law whether the instrument conformed to the requirements of the statute, and in a case of this character fine distinctions ought to be avoided that the jury may devote itself entirely to the legitimate function of determining controverted facts.

The paper offered for probate not only conformed to all the requirements of the statute, but upon its face shows an

instrument inconsistent with the finding either that the testatrix was of unsound mind, or that she was overreached in its execution. It makes bequests to persons who must have been unknown to the attorney who drew the will, as well as to the proponent. None of these bequests is unreasonable; none of them is different from what might reasonably be expected of a person of the makeup of Sophia Morison and in her environment. She had been in litigation with her brother and sister in relation to the estates of her father and mother — litigations which always develop great bitterness in families — and she had but recently entered into a contract for the settlement of these litigations and all other matters between them. Under these circumstances her gifts of $100 each to the brother and sister, and a gift of $500 to the only daughter of the sister, are certainly consistent with a sound disposing mind and memory. Her estate was approximately of the value of $15,000, and, after the various individual gifts, including $1,000 to a Methodist church, and another $1,000 to a hospital where she received treatment, she gave her residuary estate to " Reverend Edwin Corneille, now pastor of the Methodist Episcopal Church at Millbrook, New York," and it is around this gentleman and his family that the storm centers. It was the theory of the contestants, without being able to show that he ever suggested in any manner the making of a will in his favor, that in some undisclosed manner this modest Methodist minister, who was concededly not her pastor at the time and could not be regarded as her spiritual adviser, had so far dominated the mind of this alleged incompetent that he was enabled to produce a perfectly sane and sensible will, in which he appeared as the principal beneficiary, without being present, and without his having been with her for a period of several months; and it is in this connection that the learned trial court, as it seems to me, fell into serious error.

The record shows that many years ago Mr. Corneille was the pastor of the church attended by the parents of Sophia Morison, and he appears to have been a friend of the parents and of Sophia, and this attitude, shared by Mrs. Corneille and her children, appears to have continued through the years. Nothing in the evidence tends to show that this was anything more than an honorable and honest friendship, such as

intelligent and decent people often maintain, in spite of the, pessimistic assumption to the contrary which runs through the record where it is given color by counsel, and the fact that the decedent from time to time contributed small sums of money to Mr. Corneille, the father of a large family, or that she aided in the education of one of his sons, does not legitimately tend to show either that she was of unsound mind or that she was under the control of this man. Many good and sane women have done just such things in the times past; will continue to do them in the future, and, whatever we may think of the wisdom of so doing, it will not be counted against them, except in the minds of those who are bent on circumventing those wills which in life they were unable to master to their own liking. To these they will be, of course, incompetent; their acts will be irrational. The will was made and executed on the 11th day of March, 1915, and the record shows that while both Sophia Morison and Mr. Corneille were in the Methodist Episcopal Hospital of Brooklyn in the December previous, there is no evidence that he was there at the time this will was made. On the contrary, the evidence shows that Mr. Corneille left the hospital about Christmas time. The learned court in its charge said that beyond the question of whether the decedent was insane or not, the jury must determine " even though she had testamentary capacity, whether or not she was overreached by this warm and intimate relationship which existed between her and the residuary legatee under this paper; whether there was an undue influence exercised upon her so as to make it the will of Mr. Corneille instead of the will of Sophia Morison." The court then continued: " It appears that she went to Brooklyn to go to the Methodist Episcopal Hospital, one of the legatees in this will. That while there Mr. Corneille was also there during a portion of the time at least, as a patient, I believe, and you are to say whether he exercised any influence at that juncture at the time when this paper was executed; whether an influence was exercised to bring about the execution of such a paper, taking into account the language and intimate relationship that had existed for many years prior thereto."

Counsel for the proponent interrupted and called the attention of the court to the fact that Mr. Corneille left the

hospital in December, this will being made on the eleventh day of the succeeding March, but the court continued: " He was there during the time she was there. If I am in error about that you will remember, gentlemen." Counsel admitted that they were both there in December, and the court continued: " Yes, they were both there. At any rate they were both there together either at the time this will was executed or afterwards," thus leaving the jury to understand that they were both at the hospital at the immediate time of making the will, when in fact there is no evidence to support the suggestion, and the proponents must have been prejudiced by such a remark. This, in itself, would not, probably, constitute reversible error, but it is made the foundation, with other remarks calculated to impress the jury with the idea that the residuary legatee is a designing person, for further discussion in which the court confuses, rather than clarifies, the issues to be presented. Herein, it seems to me, is the essential error of the court. The court says: " Now, because of the fact that undue influence is alleged here I may perhaps enlarge a little upon that because of the long intimacy existing between Mr. Corneille and Miss Morison. There is a line of cases in this State holding that a lawyer, for instance, who procured a client of his to make himself a beneficiary, under the law must show that the will was made from proper motives and was not the result of undue influence. Where a patient makes a will of like character and makes his doctor the beneficiary, that will must be scrutinized with great care because of the confidential relation existing between the parties. It is also the rule where a person makes a will for the benefit of his spiritual adviser, his priest or his minister, such a will must have close and more careful scrutiny than though such person stood upon an equal plane and had no such relations existing between them. This principle applies to any case where there are close confidential relations existing between the parties."

This is obviously not the law; it is certainly not the rule as between husband and wife — the most confidential relation known to the law — nor does it extend to the friendships existing between people, where no fraud is practiced. " The law presumes in the case of guardian and ward, trustee and

*cestui que trust,* attorney and client, and perhaps physician and patient, from the relation of the parties itself that their situation is unequal and of the character I have defined; and that relation appearing itself throws the burden upon the trustee, guardian or attorney of showing the fairness of his dealings. But while the doctrine is without doubt to be extended to many other relations of trust, confidence or inequality, the trust and confidence, or the superiority on one side and weakness on the other must be proved in each of these cases; the law does not presume them from the fact for instance that one party is a grandfather and old and the other a grandson and young, or that one is an employer and the other an employee. The question as to parties so situated is a question of fact dependent upon the circumstances in each case. There is no presumption of inequality either way from these relations merely. * * * These relations as a matter of fact may have led to or been consistent with controlling influence on the part of the grandson or childish weakness and confidence on the part of the grandfather, but this was to be shown and is not necessarily derivable or presumable from the relations themselves as in the case of trustee, attorney or guardian." (*Cowee* v. *Cornell,* 75 N. Y. 91, 100; *Ten Eyck* v. *Whitbeck,* 156 id. 341, 353.)

While the rule is stated positively in reference to guardians, trustees and attorneys, it is said that it perhaps includes the physician, but no suggestion is made that it extends to a minister, simply because of his profession, and where he is not shown to be the spiritual adviser. The learned court concedes, in continuing the charge, that " Mr. Corneille was not the minister of Miss Morison, and had not been for years; he could not fairly be denominated, I take it, under the principle of this case, as her spiritual adviser," which would clearly exclude him from the class of relationships which give rise to any adverse presumption. "But," the court continues, " he was, as the evidence shows, a person who had a very close and confidential relation existing with her, and that relation had been established by this long acquaintance-ship, and by the fact that he had known her many years before, and had kept up that acquaintanceship. It is shown, not only by the correspondence between them, but by the correspondence between the wife and by the letters of the

son written to Miss Morison. So it may be fairly said that they had a close and confidential relation existing between them. Therefore, where undue influence is charged it is for you to take that into account in weighing the testimony and seeing whether because of that relationship he not only was enabled to but did in fact exercise such an influence upon her that this was his will and not her will; that he procured her to do what he wanted her to do and what she otherwise would not have done if she had not been subject to his influence."

It seems clear to me that the jury could not have failed to understand from this charge that because Mr. Corneille was a minister, and had known Miss Morison for a long period of years, he was bound to establish that he did not influence the testatrix in making this will. That is, any intimate friend must accept the position of a legatee under the presumption that he has abused that friendship; that is the essence of this charge, for the mere fact that Mr. Corneille is a Methodist minister, instead of a blacksmith, cannot affect the question, where it is not pretended that he was in any sense her spiritual adviser. It seems to me that all reference to a special rule which has no relation to the particular facts which are within the general rule, could have no other result than to prejudice and mislead the jury, and thus defeat the true purpose of a judicial investigation. This charge must have prejudiced and misled the jury, for it obviously had this effect upon the court; it led the court to say that in spite of the fact that Mr. Corneille was not the pastor or spiritual adviser of the testatrix, and not not been for years, yet that " it may be · fairly said that they had a close and confidential relation existing between them," and that it was the duty of the jury " to take that into account in weighing the testimony and seeing whether because of that relationship he not only was enabled to but did in fact exercise such an influence," etc. A confidential relationship is not a friendship; we may love one in whom we have no confidence in a business way. We may even love those in whom we repose no confidence whatever, and it is a misuse of language to confound a confidential relationship, in law, with a friendship which might prompt us to give even where we question the wisdom of the gift. " The meaning of ' confidential,' " say the court in *People ex rel.*

*Crummey* v. *Palmer* (152 N. Y. 217, 220), " has two elements, that of secrecy and that of trust and confidence.   Confidential relation, in law, as defined by the Century Dictionary, is a relation of parties in which one is bound to act for the benefit of the other and can take no advantage to himself from his acts relating to the interest of the other.   Such a relation arises whenever a continuous trust is reposed by one person in the skill or integrity of another." No such relationship is suggested here; all that is disclosed is a friendship enduring for many years between Mr. Corneille and his family and Miss Morison, and the suggestion that this subjected him to suspicion, or to the presumption of fraud which is involved in undue influence, is utterly without justification, and, in my judgment, constituted such error as to demand the reversal of this decree.

And it is to be observed that this alleged " close and confidential " relationship, which had existed for years, was apparently found by the same jury which found that Miss Morison was of unsound mind and incapable of making a will. This insane and irresponsible woman, full of strange conceits, changeable, erratic and generally unattractive, we are asked to believe was at the same time capable of a sustained relation with Mr. Corneille which made it obligatory upon him to show to the satisfaction of the jury that he did not supervene in the making of this instrument and cause it to reflect his will rather than that of Miss Morison.   The two propositions are wholly inconsistent with each other.   Either this woman was not an erratic, changeable and vacillating lunatic, incapable of making a will, or she was not capable of the " close and confidential " relationship which the court charged as existing. A close and confidential relationship existing for years with a lunatic is unthinkable; it presupposes a continuity of responsible thought and action, which is impossible to a person of unsound mind, and the holding of the jury that there was undue influence, resting upon the ground work of this alleged close and confidential relation on the part of one whom they have adjudged to be a lunatic, shows conclusively that they must have had a prejudicial viewpoint, the foundation of which must be found in the charge.   If the jury erred in finding her to be mentally incapable of making a will, and it be assumed

that she was capable of a lasting friendship, then she had a right to make the gift which she did make to her friend, and there is not a particle of credible evidence in this case to show that he in any manner assumed to determine what her will should contain.

The evidence is to the effect that nearly three months after Mr. Corneille had left the hospital, and, so far as appears, without having seen him in the meantime, this alleged lunatic sought out the secretary of the Methodist Hospital and went to the office of reputable attorneys, occupying a recognized position at the bar, and there dictated the terms of a will which is in all respects such an instrument as would be expected under all the circumstances. She told her attorneys the amount of her property, which the evidence discloses to have been an intelligent estimate of the value of her estate; she made specific bequests to her brother and sister, explaining that the amounts were purposely small, owing to the troubles which they had caused; she made a substantial bequest to her niece; she made other bequests to friends in Washington, and gave a substantial sum to a Methodist church and a like sum to the hospital where she had been treated, and the remainder she gave to her friend, Mr. Corneille. And why not? Her brother and sister had been engaged in litigation with her over the estates of both her father and her mother; there had been an estrangement of long standing, and she had within a short time entered into a contract with them for the settlement of the controversy and of all outstanding claims, evidently contemplating a closing of all matters between them. They had treated her at arm's length; the settlement was made through the agency of attorneys on both sides, and the transaction, of course, proceeded upon the basis of the capacity of Miss Morison to enter into contracts. The settlement had in it none of the elements of a reconciliation; it was purely and simply to be rid of the annoyance and expense of the litigation, the parties dealing as strangers and as equals, by their respective attorneys. Was there any reason why, having fixed her legal rights by means of a compromise contract, she should, in contemplation of death, turn it over to these troublesome relatives? What would an entirely normal person have done under these circumstances?

Was the disposition of her property that of a lunatic, or was it what we might fairly expect of the woman who had kept together a property approximately $15,000, and who had transacted all of her own business down to the very time of her death without a suggestion, so far as appears, that she was not entirely competent to do so until after her death? There is not a suggestion in the evidence that the attorney who drew the will was not a high-toned and honorable counselor of this court. He testifies to the matters which he was directed to put into the will, and that he had never known her until she came to his office. There is no suggestion that Mr. Corneille was known to the attorney, or that he in any way induced Miss Morison to go to this particular attorney; the proponent was brought into the matter, so far as appears, entirely at the suggestion of Miss Morison, and to say that this intelligent will could have been suggested to the mind of a lunatic in December, or at any time between December and the hour of its transcribing, and be conveyed by her to the attorney who drew it, is to disturb all of our preconceived ideas of a lunatic, and we doubt if any jury, under correct instructions, could be found who would reach such a conclusion. It is unreasonable. Such a thing could not, in the nature of things, be accomplished.

There is some evidence in the case that Mr. Corneille had informed the Methodist Hospital, at some time, that he had a friend who desired to make a gift to it, or that she was likely to do so, but there is no evidence whatever that he ever importuned her in reference to such a gift, and there is no evidence whatever that he ever made any request that she should make him a beneficiary, though there is no legal reason why he might not have done so within the limitation that such request should not be persisted in to the extent of dominating and controlling the will of the testatrix. There is no law which forbids a friend to present his claims for preferment in the final disposition of the estate; certainly no law which forbids a friend performing kindly offices and accepting the bounty of his friend, and the effort to degrade friendship to the necessity of justifying itself in the presence of a bequest, is a perversion of the statutory privilege and ought not to be encouraged by the courts.

The evidence in this case should be considered in the light of the erroneous charge, and it does not seem necessary to review the whole of it. It is sufficient to call attention to some of the alleged facts, as they are called to our attention by counsel, and to show the coloring which is attempted to be given them, to demonstrate the utter lack of merit in this case. For instance, we are told that Miss Morison never married; that when a young woman she was disappointed in love, and she always had this on her mind. We are referred to folios 738, 861, 957, etc., for particulars. At folio 738 there is a little sentimental story of an unremoved stain on the table-cloth which had never been taken out because it was left there by Mr. Gardner, her best friend. Of course this impressed Priscilla Huff as irrational. Then at folio 861 we find John H. Smith telling a story of Miss Morison appearing one day in mourning; of his inquiring the reason, and of Miss Morison saying that her intended was dead, and this impressed John Smith as irrational. At folio 957 Katie Lapolt tells of a visit to a cemetery by Miss Morison and of her telling her that an unmarked grave was that of Mr. Gardner, an old friend of hers, and that Miss Morison was not at all excited on this occasion, and Katie thought her conduct very irrational. Of course there is no evidence that this grave was not that of Mr. Gardner, an old friend, and there would not appear to be any particular reason why Miss Morison should have been excited over a grave in a rural cemetery, years after the disappointment, though I believe it is no uncommon thing for sentimental women, disappointed in love, to linger a moment by the side of an unmarked grave. But does the memory of an old romance, cherished through the years, indicate insanity? If it does then many of us would need an insurance upon our testamentary dispositions.

Then we are told that as a young girl she was struck by lightning and rendered unconscious, and was after that nervous in thunder storms. That this, together with her disappointment in love, affected her mind, and as she advanced in years her mental condition became more noticeable, although she was always peculiar and the neighbors all thought she was crazy. We are referred to folio 397 for authority, and there

Third Department, November, 1918.　　[Vol. 185.

we find that John H. Pritchard, a Presbyterian clergyman, whose church and himself were ignored in the distribution of Miss Morison's estate, testifies, not as to the thought of the neighbors, but as to his own observations of Miss Morison. He simply says that " I noticed that she became less attentive apparently to her appearance, about her appearance, and while for a while immediately after the death of her parents she was more careful she very rapidly became less careful toward the end." We are likewise told that " she accused her brother of drunkenness when he was not a drunkard," and we are referred to folio 970, where Minnie Walzer testifies that " She was always at her mother, that her brother was a drunkard, and that he only came to get things from her," and that she (the witness) never knew from any one else that he was a drunkard, which is a long way from establishing that Miss Morison was not justified in telling her mother that her brother was a drunkard. Minnie does not even say that she did not know that the brother was a drunkard; she merely says that she did not know it from any one else.

With this foundation, we are told that " this weak-minded delusion concerning her brother and sister, the Rev. Mr. Edwin Corneille, a Methodist minister, pastor of the Methodist Episcopal Church at North White Lake, N. Y., for a number of years, together with his family, used to convince Sophia that she had reason, indeed, to fear from the presence of her brother and sister," and folios 1593 and 452 are cited. At folio 1593 we find these words in a letter from Mrs. Corneille to Miss Morison: " How provoked I feel with Mrs. Fraser [the sister] for coming to bother you, you poor girl you surely have more than your share of trouble. I am glad you did not let her come to take care of you, (I didn't ever suppose you would.)" Of course, in this fragment of a letter from Mrs. Corneille there must be hidden a deep plot for the serving of the purposes of Mr. Corneille. Then at folio 452 we find this damning revelation as to the conduct of Mr. Corneille himself, by one Charles E. McKay: " I recall the day after her father died the dominie come there." Asked " Dominie who ? " the witness continued: " Corneille I guess they call him," and then after identifying the " dominie " the witness makes his revelation: " Miss Morison had said that

she had sent down after Harry and Mrs. Fraser, and he told her that was a foolish thing to do, that they would only make trouble," and soon afterward they did enter into a litigation. over the estate of the father whose death was the occasion of the interview narrated.

So I might go on through the record, showing the trivial and inconsequential matters that engaged the attention of the jury and the court, and which affords the basis of this decree, but I have already devoted too much space to the consideration of this alleged evidence. The most that can be said to be established is that the testatrix was a woman of romantic tendencies who had become somewhat soured and suspicious ·of her fellow-men,. but who had at no time failed in the comprehension of her business affairs. She had a full and complete comprehension of her property; understood who were her heirs and next of kin, and these she provided for to the extent of her desires in that direction, and she made a will in all respects in harmony with the life she led and the experiences she had passed through with her brother and sister. This will was executed with due regard to the forms of law, and there is no evidence in this case which would warrant an unprejudiced jury in reaching the conclusion that there was any undue influence, or to overcome the presumption of sanity on the part of the testatrix at the time of making this will. The verdict of the jury is inconsistent, is against the evidence and the weight of the evidence, contrary to law, and should not be allowed to stand. (*Matter of Fleischmann*, 176 App. Div. 785; *Matter of Ruef*, 180 id. 207.)

The decree should be reversed on the law and facts and the matter remitted to the Surrogate's Court to enter a decree in harmony with this opinion, with costs to the appellant.

All concurred, except LYON, J., dissenting, with an opinion, in which COCHRANE, J., concurred.

LYON, J. (dissenting):

Sophia Morison died on the 16th day of August, 1915. She was of the age of fifty-two years. She left an instrument in writing, of date March 11, 1915, purporting to be her last will and testament. In this will Otto Brand was named as executor, and he presented and filed in the surrogate's office

Third Department, November, 1918.        [Vol. 185.

a petition for the probate of said will.   Harry G. Morison and Antoinette Fraser, her brother and sister and only heirs at law and next of kin, filed objections to the probate thereof and demanded a trial of the issues by a jury.   Thereafter an order was made directing the trial in the Supreme Court before a jury of the following questions: " 1. Is, or is not, the instrument propounded herein the last will and testament of Sophia Morison, deceased?   2. Was, or was not, such instrument duly executed as required by law?   3. Was, or was not, said Sophia Morison at the time of making such instrument of sound mind and memory, and capable of making a will?   4. Was, or was not, the execution of said instrument by said Sophia Morison obtained by undue influence? "   The jury decided the first three questions in the negative, and the last question in the affirmative.   From the decree of the Surrogate's Court entered thereon this appeal has been taken.

The father and mother of Sophia Morison, with whom Sophia lived, died in 1913.   Each left a will by which the greater portion of the property was given to the two daughters. Their brother filed objections to the probate of both wills.   He also brought an action against both the sisters in relation to the real estate.   The will contests were finally compromised and settled by the sisters deeding to the brother ten acres of land including a mill.   As a result of the legal proceedings, the relations between Sophia Morison and her brother were unfriendly.   The relations between Sophia Morison and her sister continued friendly.   Prior to 1900 the parents were members of the Mongaup Valley Presbyterian Church.   During the years 1901 and 1902 Rev. E. Corneille was the pastor of the North White Lake Methodist Church.   During the time while he was in charge of that church Sophia Morison and her parents became members thereof.   Thereafter Rev. Corneille became Sophia's adviser, and he and his family remained close friends with her after moving away from White Lake. They visited at her home, and she made them presents of money, depositing money in the savings bank in trust for the wife, and numerous endearing letters passed between them. She advanced a portion of the expenses of educating the son as a physician.   The relations between her and the Corneille family were of the most confidential character.   In the city

of Brooklyn there was a Methodist Episcopal hospital over which Otto Brand from 1913 was field secretary. One of his duties was to interest and interview persons who were in a position to give financial assistance to the hospital. In 1913 Rev. Corneille wrote to the superintendent that he had been speaking to a lady friend about the hospital, and that she was about making her last will and would like to leave it something, so that if they had any special form to send it on and he would attend to the rest. In response such form was sent him. In August, 1914, he again wrote the superintendent stating that his friend was anxious to leave this hospital $1,000 as a thank offering for the recovery of his son, and was going to have it done next week while he was there on his vacation, and asking the superintendent to kindly send him a form. This was done, with a letter of thanks for his interest in their work. In December, 1914, Sophia Morison went to the hospital for treatment and remained there about four weeks. She was treated for heart disease only. While she was at the hospital Rev. Corneille was there a portion of the time as a patient. He had made the arrangements for her going there. His wife started from White Lake with Sophia, coming as far as Newburgh, and his son met her at Weehawken and took her to the hospital. While she was at the hospital Rev. Corneille visited her, and she became acquainted with Rev. Otto Brand, who was also a Methodist clergyman, and who had been informed by Rev. Corneille that she was the person whom he had written would leave to the hospital $1,000. She was also visited by Mr. Webel who was the administrator with the will annexed of her father's and mother's estates. She spoke to him of her will, and said she wished she had made her peace with her brother and sister before she left. She said that she would like to be on friendly terms with them, but that she would not send for them. He told her that she would never be on friendly terms with her brother as long as she stuck so close to Rev. Corneille, as there was a very bitter feeling there. She said " yes, I [know]. In the future I shall act differently." At the time Webel called upon her at the hospital he also saw Rev. Corneille there. She wrote to her sister while in the hospital, who visited her and the relations appear to have been generally

friendly. She also wrote to her niece Helen, the daughter of her sister, of whom she appears to have been very fond, and to whom she stated she would leave the bulk of her property. On the 10th day of March, 1915, she came alone to the hospital, Brand says, and saw him and told him she had come down to Brooklyn to make her will as she did not wish it to be known at home and wanted him to recommend a lawyer. He knowing of her expressed intention to make a gift to the hospital telephoned its lawyer. He was not in and was directed to his cousin. He made an appointment with Rev. Brand by telephone and at her request went with her. Upon arrival at the lawyer's office he introduced himself and her. She told the lawyer that she wished to make a will, and explained the trouble she had in relation to her father's and mother's wills. She said that she wanted to make them small gifts so they could make her no trouble, $100 to each, and wanted a clause in the will that any one contesting it should not have anything. He told her that she could do as she liked with her property, and to put in such a clause in connection with so small a legacy would tend to anger them and be liable to make trouble. She told him she had about $15,000, and to give her brother and sister each $100; a friend $500; her niece $500; two friends $200 each; $1,000 to the Methodist Church at White Lake; $1,000 to the Methodist Hospital at Brooklyn, and the balance of about $12,500 to Rev. Edwin Corneille, referring to a note book while talking, thus bequeathing almost her entire property to strangers of the blood. The lawyer asked her whom she would have for executor and she asked if it was necessary and was told it was advisable. He then asked her if there was no one she had confidence in; receiving no reply he asked her if she could trust Rev. Brand and she asked him if he would accept. He, after asking whether his appointment as executor would affect the legacy to the hospital, and being assured that it would not, accepted. She was told that the will could not be completed that day and she and Rev. Brand left after making an appointment for the next day. She remained over night in Brooklyn and the next day went to the hospital where she met Rev. Brand and together they went to the lawyer's office where the paper was executed

with the lawyer and his brother acting as witnesses. She left the paper in the custody of the lawyer, and returned home. It bore the date of March 11, 1915. About the month of June, 1915, she talked with Mr. Webel about his bringing a lawyer from New York to make a will, saying she did not want any of the Sullivan county lawyers. She said she had done something that was not right, and she wanted to rectify it. He told her he had a friend, a lawyer at Mt. Vernon where he lived, and that he might get him to come up and make arrangements with him, writing her July 12, 1915, that if she wished him to come up with the attorney he spoke about, to let him know and he would bring the attorney with him and he could attend to all matters she wanted him to. On July 29, 1915, she sent the Rev. Corneille a check for $75. On July 16, 1915, she also donated $1,000 to the hospital under an agreement that it would pay her four and one-half per cent interest thereon during her lifetime. Mrs. Corneille was very attentive to Sophia Morison during July and August, 1915, preceding Sophia's death. Sophia complained to Mr. Webel that she wished Mrs. Corneille would leave her alone once in a while so she could breathe. The possible explanation of the reason for not having the lawyer from White Plains come up to draw her will was the constant presence of Mrs. Corneille. It seems probable that her giving the hospital a check for $1,000, and Rev. Corneille a check for $75 were in contemplation of changing her will. Nothing in the record indicates her intention to give the hospital $2,000.

The evidence clearly establishes that she was a nervous, irritable person, changeable to her friends and neighbors, and suspicious of all with whom she was associated or did business, except the Corneille family. The weight of evidence was that she was uncleanly, and odd in her dress. She said she was queer, and asked her physician to give her a statement that she was sane. After her death there was found in her safe deposit box in the bank upon a blank will a statement dated April 20, 1907, purporting to have been signed by a physician that he had that day examined and found her perfectly sound in mind and body. For a number of years she expressed fear that her brother and a physician were attempting to have her sent to an asylum. At the age of

twenty she suffered a stroke which paralyzed the whole left side of the body, from which she recovered in one and a half years. There is much evidence of her business transactions, her queer sayings, actions and appearance for a number of years. She was poorly nourished, complained that her right leg was growing rapidly weaker, that she just dragged it along and that she could not raise it and put on her shoe. There was in evidence the opinions of lay witnesses and physicians who saw her, as to her mental capacity for making a will. They characterized her actions and sayings as irrational. The superintendent of the Middletown State Hospital for the insane who had been connected with the hospital for thirty years, and the assistant superintendent who had been connected with it for nineteen years were called as witnesses and both testified that, in their opinion, she was not of sound and disposing mind, but was insane. More than thirty people in the community were called as witnesses and testified as to her slovenly habits, which had grown worse as she grew older, and to acts and sayings which they characterized as irrational.

The Corneilles were present in court, and although they would have been most important witnesses did not see fit to subject themselves to examination.

The trial was had in May, 1917, before a jury and one of the oldest and most respected justices of this court. It commenced on the fourteenth day of May and concluded on the twenty-second day of May. The record contains 600 pages. The charge occupied 13 pages. At its close not an exception was taken to it by either party. The proponents made two requests to charge which were substantially complied with. At the close of the trial the proponents moved to set the verdict aside and for a new trial. The court denied the motion. No complaint is made by the proponents in their brief of an exception. The case must finally be determined by a jury. No reason appears why another jury would decide the case differently. The case could not be more carefully tried.

The decree should be affirmed, with the costs of the appeal.

COCHRANE, J., concurred.

Decree of the Surrogate's Court reversed on law and facts, and matter remitted to said court to enter a decree in harmony with the opinion of WOODWARD, J., with costs to the appellant. This court disapproves of the findings of the jury No. I, II, III and IV, and finds that the instrument propounded herein is the last will and testament of Sophia Morison, deceased; that the same was duly executed as required by law; that the said decedent, at the time of making such instrument, was of sound mind and memory, and capable of making a will; that the execution of said instrument by said decedent was not obtained by undue influence.