In the Matter of Proving the Last Will and Testament of CAROLINE STERN, Deceased.*

S. SIDNEY STERN, Appellant; NEW YORK TRUST COMPANY and SAMUEL STRASBOURGER, Respondents.

First Department, March 18, 1932.

---

* Affg. 137 Misc. 668.

*I. Maurice Wormser* of counsel [*Benjamin Weiss,* attorney], for the appellant.

*Nathan L. Miller* of counsel [*Max L. Schallek,* attorney], for the respondents.

*John A. Bell, Jr.,* special guardian for Alan Stern and others, infants.

SHERMAN, J.   Caroline Stern died on June 15, 1929, aged sixty-five, a widow whose husband, Louis Stern, had died in 1911.   She was survived by four children, the youngest of whom was aged thirty-six.   By her will as admitted to probate the older daughter, Mrs. Velleman, and the older son, S. Sidney Stern, have been disinherited.

The will is dated April 28, 1926.   Under it she divided her jewelry and household effects between two of her children, Sara S. Lehman and Abraham Stern.   Bequests were made to an aunt and to a servant, as well as to several charitable institutions, and the residue of the estate was divided into two equal parts, the income from one of which was to go to her daughter Mrs. Lehman, and from the other to her son Abraham Stern, with the remainders to their respective children.   The will contained, paragraph 7th, the following disinheriting clause:

" *Seventh.* I give and bequeath to my son S. Sidney Stern and my daughter Bertha Velleman, each the sum of one dollar.   I make this bequest because of the fact that I have out of my personal estate and property given to each of them the sum of Five thousand five hundred dollars during my lifetime and for other reasons which are best known to themselves."

A codicil thereto was executed on January 26, 1927, which altered the provision for the issue of her son Abraham Stern, and an additional codicil was made on December 11, 1928, which increased

the legacy to a maid servant. These three papers have been admitted to probate.

An earlier will had been made on May 4, 1922, in which the residue of the estate had been divided between all of her children, so that Sara S. Lehman became entitled to five-sixteenths, Abraham Stern five-sixteenths, S. Sidney Stern four-sixteenths and Bertha Velleman two-sixteenths.

The paragraph containing that disposition was altered by a codicil dated December 19, 1923, in which appears for the first time in any testamentary document, the intent of the testatrix to disinherit her two older children, for it contains phraseology akin to the language of paragraph 7, above quoted. . Under that codicil, the residuary estate was divided equally between Mrs. Lehman and Abraham Stern. That disposition was confirmed by a codicil dated June 9, 1924, whereby the will of May 4, 1922, and the codicil of December 19, 1923, were further ratified. The last-mentioned codicil also excluded S. Sidney Stern from participation in certain jewelry mentioned in the will of May 4, 1922. These codicils were followed by the will of February 21, 1925, in which is found the same disinheriting provision as in the last will.

Accordingly her determination to exclude her daughter Bertha Velleman and the contestant from sharing in the residuary estate was made manifest in December, 1923, and remained unaltered to the date of her death, a period of five and one-half years.

The only child who has objected to probate is the son S. Sidney Stern. The objections filed by him raised the issue of undue influence as well as lack of testamentary capacity; this contention that the will and codicils presented for probate were the result of undue influence has been abandoned. It now stands conceded that in executing these instruments she was free and unconstrained.

Much testimony was introduced by contestant upon the general physical and mental condition of testatrix, showing, if accepted, a tendency toward moroseness and penuriousness, as well as a great desire for money and some eccentricities, such as taking soap, towels and kindred articles from hotels and restaurants, and using rags to be made up into undergarments. She had been ill, suffering at various times from neuritis, diabetes, hardening of the arteries and heart disease, which ailments, however, did not foreclose her from her customary activities. On the other hand, much contradictory evidence was introduced, both oral and documentary, which tended to prove that she was a clever, intelligent and normal woman, considering her age and ailments, who lived well, had managed her own finances as well as her husband's estate, maintained several bank accounts, and even prepared the working sheets

for her income tax returns. That she made gifts and showed on many occasions a benevolent spirit appears from seventy-four checks drawn to various charitable institutions during the last seven years of her life and from the charitable bequests found in her will.

In view of the foregoing and of the many clear communications in the record in her own handwriting, as well as the evidence showing the manner in which she attended to the settlement of her husband's estate and conducted the management of her own affairs, her energy and her interest in current affairs, financial, political and social, the contestant does not now claim that she was not possessed of general competency, sufficient to make a testamentary disposition at the times when the last will and codicils were executed, but he asserts that this condition of mind was corrupted by an overpowering delusion with respect to him, in that she actually believed that he intended to murder her and in these wills and codicils gave expression to this delusion, which amounted to a monomania depriving her of testamentary capacity.

After the proponents had rested with sufficient proof of the execution of the will and the codicils and of the testamentary capacity of the testatrix, the contestant called witnesses to show this want of testamentary capacity. Some of these witnesses quoted testatrix as suspecting a daughter-in-law of infidelity, while others spoke of the eccentricities above referred to and acts indicating at times a dislike of her grandchildren and the infliction of severe punishment upon one grandchild, who was living with her in 1926.

The main witness for the contestant was Mrs. Lee, who had lived with Mrs. Stern for several months beginning in 1923, and later a short time in 1929, up to the hour of testatrix's death. She had likewise been called to attend her during an illness in 1925. By means of a deposition upon written interrogatories taken abroad under the auspices of the contestant, who brought her from Nice to Paris for that purpose, Mrs. Lee gave evidence of Mrs. Stern's eccentricities and parsimoniousness, and she also said that Mrs. Stern had spoken of the contestant to her in 1923, and thereafter, and had stated that he wanted to kill her and get her money. However, she heard Mrs. Stern request her maid to ask her son Sidney, the contestant, to come to see her and express a desire to see him, which seems inconsistent with any real fear or dread. She also asserted that when she came back to live with Mrs. Stern in May, 1929, the testatrix repeated the expressions relating to contestant and his desire to get her money. She likewise mentioned that in 1925, when as nurse she attended Mrs. Stern who was

ill, her son Sidney called to see her, but Mrs. Stern stated, " I won't see him; he is only coming to kill me and to try to get my money," and that she thereupon told the contestant what his mother had said. A chauffeur testified that testatrix made remarks in the year 1926 to the same effect, and a dentist that she said that the contestant and Mrs. Velleman wanted her out of the way because all they wanted was her money.

The only witness whose testimony refers to a time anterior to or coeval with the will of December 19, 1923, was Mrs. Lee. That is when this so-called delusion is said to have originated or at least first found expression in any testamentary paper. This testimony, however, does not suffice to show a delusionary state of mind present when she actually executed the testamentary documents in which she placed the disinheriting clause. Such occasional expressions do not, under the facts of this case, show the existence of a dominating delusion amounting, as is claimed, to a monomania. They were never accompanied by any acts on her part evidencing fear of personal harm, or the seeking of any precautions to prevent anticipated violence by her son.

Furthermore, the disinheriting clause, it will be observed, applied alike to Mrs. Velleman and to contestant, and revealed a specific reason applicable to each for the action which she was taking.

The disinheriting codicil of December 19, 1923, mentions the payment of $5,500 to Mrs. Velleman and states her intent to pay to contestant the sum of $5,500. She later, as executrix of her husband's estate, drew checks to his order aggregating $10,122, and, upon her individual account, a check to his order for $5,500, which were delivered to her attorney to be handed to contestant. He, however, raised a claim to additional interest and held up the matter so that it was not settled until June, 1924, by an additional check to cover such interest.

There is no claim that at that or any other time the testatrix expressed any fear of actual violence at the hand of Mrs. Velleman. If she had been governed by a controlling delusion as to the one child, but not as to the other, it would be natural to expect that the will would disclose its existence. But the same language was employed as to both. The explanation why testatrix, a woman possessed of general mental competency, undertook to exclude from participation in her estate this daughter and son was quite clearly shown. She had paid each $5,500 from what she believed to be her personal estate, and she was not on cordial terms with either, while her intimacy with and friendly feeling towards her other two children persisted.

The controversy between Mrs. Velleman and her mother had

grown out of a disagreement between Mr. Velleman and testatrix, and Mrs. Velleman had sided with her husband. That had occurred before December, 1923, and had left them mutually embittered. Shortly before the execution of the codicil of December 19, 1923, Mrs. Stern had desired to settle outstanding questions regarding the estate of her husband, who had died in 1911, and whose estate she had been administering as executrix. A dispute had arisen as to whether or not a mortgage for $44,000 taken in her name belonged to that estate or to her, and whether she was entitled to all or only one-half of the principal thereof. If entitled to one-half, then each of the four children would receive $5,500 (that being the sum mentioned in paragraph 7 of the will). Her attorney undertook to settle this question and did finally compose it with Mrs. Velleman, to whom he paid $5,500, but the contestant, taking an even more hostile attitude, declined to accept that sum of money. This was the situation when the codicil containing the first disinheriting clause was executed, wherein is found the statement that a payment in that amount had been made to Mrs. Velleman and would be made to contestant. Contestant insisted upon additional interest and delayed signing a release for several months until he was paid full interest, beyond what his mother had received while the moneys were lying idle in the bank. From this it will be seen that paragraph 7 was not based upon a delusion, but upon a viewpoint which (whether narrow or prejudiced is immaterial) rested upon a fact.

It also appeared in evidence that contestant, who had resided with his mother at the Hotel Ansonia, in 1920 went to live apart from her. In 1921 he married. In 1923, during marital differences which arose between contestant and his wife, his mother wrote him an endearing letter expressive of her love for him. She took care of him and was solicitous about his personal welfare. Their relations seemed to remain friendly until toward the end of 1923, after contestant returned from Europe. Then he went to live at the Hotel Hargrave, where Mr. and Mrs. Velleman resided, and where, according to an affidavit which contestant filed in litigation between himself and his wife, he was living in the apartment with them. At all events he either lived in their apartment or took an adjoining one, to be with them. At that time the relations between Mr. and Mrs. Velleman on one hand and the testatrix on the other were, as stated, marked by bitterness, and the contestant appeared to have aligned himself with Mr. and Mrs. Velleman. Indeed, in the matter of the disposition of the mortgage above mentioned which was being arranged at that time, he and Mrs. Velleman had conferred together and taken somewhat similar positions.

During that period a bitter altercation between contestant and his mother took place, according to the testimony of Mrs. Abraham Stern, in the early part of December, 1923, and just before the execution of the disinheriting codicil of December 19, 1923, at which the contestant called his mother a thief and used other opprobrious language which infuriated her and aroused a feeling of enmity toward the son whom she had apparently treated up to that time with kindness and affection. Witnesses were called to whom the testatrix had related this altercation and its effect upon her, showing its deep impression upon her mind. This bitterness so created may not be found to be due to any delusion or monomania, but to outraged pride and resentment at her son's conduct. That feeling surely did not deprive her of her right to show her displeasure by disinheriting him.

Respondent shows that at the time that testatrix declined to see contestant in 1924, she was suffering from a painful illness. It does appear that thereafter she did express a desire to see him. Indeed, in the early part of 1924 he had been present at her sixtieth birthday celebration, and it is not claimed that she manifested any fear of violence at his hands. There is no proof that she ever avoided seeing him when he called, except upon the one occasion of her illness, related by Mrs. Lee. · Apparently after December, 1923, contestant, it was, who did not attempt to continue his earlier intimacy by actively seeking out his mother with frequency. On the contrary, he appears rather to have absented himself. The drift away was his. He sought no reconciliation. Such conduct on his part can only be ascribed to his recognition of the actual bitterness which existed between them and not to the alleged monomania on her part, on the basis of which it is sought to annul her testamentary disposition.

We conclude that there was no evidence which ought to have reasonably satisfied the jury of the presence of a dominating monomania (being the delusion that her son intended to murder her), and that it operated to dictate the disinheriting clause. If there be no evidence that ought reasonably to satisfy a jury of the facts necessary to be established, the situation is as if there were a total lack of evidence. (*Matter of Case*, 214 N. Y. 199; *Matter of Burnham*, 234 id. 475.)

In *Matter of Nicholas* (216 App. Div. 399; affd., 244 N. Y. 531), where a like contention was unsuccessfully urged, the record contained a letter from testator to his attorney stating that he did not think that his life was safe at the hands of his son, and in addition the testimony of a number of witnesses showing repeated declarations of fear that his son might kill him. In that case, as

in this, there was no actual basis in fact for that belief, if it existed. It was held that the disinheriting intent was due to no delusion, but was based upon existing facts, and no jury question was presented. The language of the Nicholas will stated that the disinheritance was due to the unfilial conduct of the contestant toward his father. In this case the will assigns as a specific reason that testatrix had given to the older daughter and to the contestant the sum of $5,500 each, and stated there were other reasons. In the *Nicholas* case the court said (p. 402): " As to the claim that an insane delusion possessed the testator that Grosvenor was actually trying to kill him, I doubt if the evidence is sufficient to show such a belief on the part of the testator, but, even if the testator entertained this belief, and it be regarded as an insane delusion, it will not invalidate the will, unless it is shown that the will was the result of such insane delusion, and that no other reasons existed for the making of the will disinheriting Grosvenor."

Other reasons exist here why Mrs. Stern desired to disinherit these two children. They need not be restated in detail. The evidence clearly establishes that the family breach, the dispute over the mortgage and the altercation with contestant were the reasons for the disinheritance of contestant.

Nor does the opinion of the experts who answered hypothetical questions create an issue. In *Matter of Burnham* (201 App. Div. 621; affd., 234 N. Y. 475) the order of the surrogate denying probate upon the verdict of a jury adverse to the will, was set aside, despite the opinions of physicians based upon hypothetical questions that testamentary capacity was lacking, the court holding that against evidence of facts showing the existence of testamentary capacity, the opinions of experts based upon hypothetical statements are of no avail. The Court of Appeals in that case took occasion to differentiate probate proceedings from actions at law, because a supervisory power over the decisions of the Surrogate's Court has for many years existed in the Appellate Division in this State, which has power to direct a final decree admitting a will to probate, where in its judgment a verdict against the will should not have been found.

In *Matter of McGraw* (9 App. Div. 372), where the testator left all of his real and personal property to his half-brother, except for a $500 bequest to his sister, the court stated (p. 380): " * * * with his brother he lived in peace and affection, and confidence seems to have existed between them. From his sister he had been long estranged, because of a bitter family feud, and it is immaterial which is to blame in that controversy; a reason appears why the decedent, whether in health or in sickness, might well prefer the

brother to the sister, and, therefore, his will in regard to the beneficiaries is consistent with his natural inclinations."

It cannot be said that it is out of harmony for Mrs. Stern to disinherit the two children who had given her trouble during her lifetime, and with whom she had to deal at arm's length in settling the dispute which arose over the father's estate. (*Matter of Brand*, 185 App. Div. 134; affd., 227 N. Y. 630.) The later documents which have been admitted to probate are in accord with her intention expressed in 1923 and reiterated in the papers of 1924 and 1925, to disinherit the two children who were not on terms of amity with her. She had no delusion on that subject.

A careful examination of the facts in this record shows the correctness of the view taken by the learned surrogate in upholding the testamentary documents and in directing their admission to probate. The surrogate was not required to submit to the jury the validity of this will and codicils under the evidence in this record.

The decree of the surrogate should be affirmed, with costs.

FINCH, P. J., MERRELL, McAVOY and MARTIN, JJ., concur.

Decree affirmed, with costs.