In the Matter of the Petition of WILLIAM POWERS to Prove the Last Will and Testament of MARY POWERS, Deceased.

WILLIAM POWERS, Petitioner, Appellant; RICHARD SPAETH and Others, Respondents.

Second Department, January 5, 1917.

Will — contest in Surrogate's Court — evidence — testamentary capacity — due execution of will — fraud and undue influence — proof of undue influence.

Proceeding in a Surrogate's Court to determine the validity of a will alleged to have been procured by fraud and undue influence, and not to have been properly executed. Evidence examined, and *held*, to establish the testamentary capacity of the testator and the due execution of the will, and to be insufficient to justify a finding of fraud and of undue influence.

Undue influence must amount "to coercion and duress." There must appear a moral coercion destructive of free agency or an importunity irresistible that causes the testator to act against his actual will

There must be "affirmative evidence" of the facts from which such influence is to be inferred, and it will not be inferred from motive and opportunity. The exercise thereof upon the very testamentary act must be proved.

APPEAL by William Powers, the petitioner, from so much of a decree of the Surrogate's Court of the county of Kings, entered in the office of the clerk of said court on the 26th day of April, 1916, upon the verdict of a jury as adjudges that the execution of the alleged last will and testament of Mary Powers, deceased, was procured by fraud and undue influence, and that the alleged will is, therefore, invalid and void.

An appeal is also taken from an order of said Surrogate's Court, entered in the office of the clerk of said court on the 26th day of April, 1916, denying petitioner's motion to set aside the verdict of the jury and for a new trial as to the finding of fraud and undue influence.

*Frederick N. Van Zandt* [*Joseph A. Burdeau* and *Reuben L. Haskell* with him on the brief], for the appellant.

*Charles J. Belfer*, for the respondents.

JENKS, P. J.:

This is a will contest in the Surrogate's Court. The proof justified beyond discussion the findings of the jury of testamentary capacity and of due execution of the will. It did not justify the finding of fraud and of undue influence.

In *Matter of Kindberg* (207 N. Y. 220, 228), CULLEN, Ch. J., for the court, says: "Undue influence is an affirmative assault on the validity of a will, and the burden of proof does not shift, but remains on the party who asserts its existence." Such influence must amount "to coercion and duress." (*Smith* v. *Keller*, 205 N. Y. 44.) There must appear a moral coercion destructive of free agency, or an importunity irresistible that causes the testator to act against his actual will. (*Brick* v. *Brick*, 66 N. Y. 149; *Matter of Snelling*, 136 id. 515.) There must be "affirmative evidence" of the facts from which such influence is to be inferred, and it will not be

inferred from motive and opportunity. (*Cudney* v. *Cudney*, 68 N. Y. 152.) The exercise thereof upon the very testamentary act must be proved. (*Seguine* v. *Seguine*, 3 Keyes, 663; *Matter of Green*, 67 Hun, 531; Schouler Wills [5th ed.], § 232.)

The testator, when 67 years of age, made the will, nearly two years before her death. She gave virtually all of her estate of about $5,000 to Powers, the proponent and the sole executor. Her three brothers, her sole heirs and next of kin, who were cut off with $5 each, are the contestants. The testator and Powers had lived together, but were not legally married. While the law did not recognize their relation, it would not have condemned, as if a code of morals, a will made in Powers' favor, even if he had been but a paramour. (*Matter of Mondorf*, 110 N. Y. 456.) But it appears that the relation was something more than carnal. For the testator and Powers, who was the junior by 11 years, went through a marriage ceremony in 1909, and, with the exception of an interval of separation of some months, due to an estrangement, lived openly as man and wife until her death in 1915. She bore his name and they seem to have been regarded as man and wife. There was a legal impediment to a marriage, because Powers had a wife. It appears that, within a year after the ceremony, the testator learned of Powers' matrimonial difficulties, which were many, involving even a conviction of bigamy. And she wrote in this that she was conversant with these matters, but that, ever since the ceremony, she had lived with Powers as his wife and had entertained for him the highest regard, love and affection as if his lawful wife, in consideration of his demeanor towards her. The learned counsel for the respondents argues that no woman, in the absence of undue influence, would thus record her shame. It may be answered that such declaration was not exactly a publication of a *secret* transgression, for her relation to Powers was well known to her kith and kin, and that if she was not obscure enough to escape outside calumny as the result of such declaration, in any event such calumny would never reach her ear. There is nothing strange in her benefaction to Powers to the exclusion of the contestants. She possessed but a small estate, and they, her heirs at law and

Second Department, January, 1917.      [Vol. 176.

next of kin, were grown men, of whom none appears as needy. Moreover, in her will she states that her scant provision for them was dictated by their neglect and lack of interest save as prompted by a desire to secure her property.

Some stress is laid by the respondents upon the fact that, even after her "marriage" with Powers, the testator made a will that excluded him, to the sole benefit of her heirs and next of kin. While this act was relevant to the issue of undue influence (*Ridden* v. *Thrall*, 125 N. Y. 572, 576, 577), it is weakened by the fact that such will was made about one week after the testator's quarrel with Powers that resulted in the temporary separation heretofore mentioned, during which period she had returned to live with her brother and his family. And, as I have said, the testator and Powers thereafter resumed their relation that continued for some years and until her death, and the will now in question was made about two years after reunion.

We are pointed to considerable evidence that the relations between the testator and her relatives were friendly and cordial throughout her life; that their cessation of visits to her was due to the objection of Powers; that her continuance of such relations was concealed by her from him; that she feared him, removed her strong box to her brother's house; that he attempted once to stab her; that they quarreled sometimes; that he was abusive at times; that he importuned her for money, refused to work; that she was in constant fear during their separation; that he had threatened her life and that he had presented her with a will which he sought to have her execute. Very largely this evidence was from the lips of the members of the testator's family. Of course, upon consideration of the verdict, we must assume that the jury credited it. But we must remember that such evidence was not proof of undue influence, inasmuch as it was mere hearsay. (*Waterman* v. *Whitney*, 11 N. Y. 157; *Matter of Woodward*, 167 id. 28; *Smith* v. *Keller*, 205 id. 39.) It was but proof of the condition of testator's mind (*Marx* v. *McGlynn*, 88 N. Y. 358; *Matter of Woodward, supra*), and it was so limited by the learned surrogate with a commendable caution to the jury. Even if the jury disregarded the testimony of Powers' son, that during

the estrangement the testator and his father met on several occasions in apparent friendliness, we cannot assume that the jury disregarded the testimony elicited from the contestants' witness, that they themselves had spoken ill of Powers with the effect of causing difficulties and unpleasantness between them and him.

The circumstances of the testamentary act do not justify a finding of the exercise of undue influence. The testator, who had kept her own property in her possession and who had managed it, was of undoubted testamentary capacity. The will was prepared by a reputable attorney, who, when called by the proponent, was naturally enough precluded by the contestants' objection from detailing his relations with his client. The will was taken to the testator's house by a clerk of the attorney, accompanied by a proposed subscribing witness. The testator received the will, looked it over and said that it was in accord with her instructions. The clerk then read it over to her, she again approved it, and thereupon executed it. She was then about her house, appeared in no way indisposed and in no way under restraint. The clerk thought that while he was reading the will Powers came into the room, but said nothing to the testator. The other subscribing witness, while corroborating the clerk in many particulars, testifies that Powers was not present during the reading of the will, came in thereafter, but went out again, and was not present when the testator subscribed the will.

Undue influence itself is a species of fraud. (*Matter of Smith*, 95 N. Y. 522.) The record is bare of any indication of fraud as distinguished from coercion or duress. I advise that the decree of the Surrogate's Court of Kings county and the order denying a new trial be reversed, and that a new trial be ordered, costs to abide the event.

STAPLETON, MILLS and RICH, JJ., concurred; CARR, J., not voting.

Decree of the Surrogate's Court of Kings county and order reversed and new trial ordered in said court, costs to abide the event.