In the Matter of the Probate of the Last Will and Testament of AURELIA FLEISCHMANN, Deceased.

CHARLES EICK, Appellant; FREDERICK GRAF, Respondent.

Second Department, February 16, 1917.

Will — probate — evidence of fraud or undue influence — burden of proof.

In a proceeding for the probate of a will, the validity of which is contested upon the ground of fraud or undue influence, the burden of proof is upon the contestants and cannot shift.

They are bound to produce proof of facts showing coercion or duress — a moral coercion destructive of the testator's free agency or an irresistible importunity that forced the testator to act against her actual will.

Evidence in such a proceeding examined, and *held*, insufficient to establish fraud or undue influence.

Although direct proof of fraud or undue influence is not essential, there must be affirmative evidence of facts to indicate the exercise of the will of another, and it must be shown that such coercion, duress or domination was exercised over the very testamentary act itself. But this rule should not be carried too far.

The law does not require that the making of a will should originate with the testator, provided he intended it as his own will and understandingly adopted it.

APPEAL by Charles Eick from so much of a decree of the Surrogate's Court of the county of Kings, entered in the office of said Surrogate's Court on the 29th day of June, 1916, as adjudges that the execution of the alleged last will and testament and codicil of Aurelia Fleischmann, deceased, were procured by fraud or undue influence practiced upon the decedent, and that said papers propounded for probate are null and void.

An appeal is also taken from an order of said Surrogate's Court, entered in the office of said Surrogate's Court on the 29th day of June, 1916, denying proponent's motion for a new trial made upon the minutes.

*William Howard, Jr.*, for the appellant.

*A. I. Nova* [*R. M. Cahoone* with him on the brief], for the respondent.

JENKS, P. J.:

The proof did not justify the jury's finding of fraud and undue influence. The burden was upon the contestants and could not shift. (*Matter of Kindberg*, 207 N. Y. 220, 228.) They were bound to adduce proof of facts that showed coercion or duress — a moral coercion destructive of the testator's free agency or an irresistible importunity that forced the testator to act against her actual will. (See *Matter of Powers*, 176 App. Div. 455, decided by this court January 5, 1917, citing authorities.) It is said cogently by CHASE, J.; in *Smith* v. *Keller* (205 N. Y. at 44): " A will cannot be avoided because of the influence of another, unless it appears that the influence exerted was so potent at the time the will was made as to take away and overcome the power of the testatrix at that time to act freely and upon her own volition. The influence of another to avoid a will must amount to coercion and duress." While direct proof was not essential, yet there must have been affirmative evidence of facts to indicate the exercise of the will of another. (*Cudney* v. *Cudney*, 68 N. Y. 152.) And it must have been shown that such coercion, duress or domination was exercised over the very testamentary act itself. (*Matter of Powers, supra*, and authorities stated.) But this rule, as Lord CRANWORTH, C., observes, should not be carried too far, for if the jury saw that the testator, at or near the time of the execution, was under such influence that in important transactions she was not a free agent, then, under circumstances that indicated her similar subjection in the execution of the will, even in the absence of proof bearing directly on the execution, the jury could find undue influence. (*Boyse* v. *Rossborough*, 6 H. L. 2, 50.)

The burden upon the contestants required proof of circum-

stances as led justly to the inference that undue influence was employed, so that the will did not express the real wishes of the testator. (*Brick* v. *Brick*, 66 N. Y. 144.)

The jury were satisfied, as shown by their verdict upon the other issues, that the testator was of testamentary capacity, and that she duly executed the will. In England the House of Lords has declared, per Lord CRANWORTH, C., in *Boyse* v. *Rossborough* (*supra*, 51): " In order to set aside the will of a person of sound mind, it is not sufficient to show that the circumstances attending its execution are consistent with the hypothesis of its having been obtained by undue influence. It must be shown that they are inconsistent with a contrary hypothesis."

The testator was a widow of 70 years of age, with whom lived Eick, a man about 15 years her junior. She gave her estate of $6,000, except a legacy of $1,000 to a granddaughter, to Eick in disregard of her son and her daughter, heirs at law and next of kin. Eick went to live with the testator after her husband's death, an association not acceptable to testator's family, especially as they believed that it was meretricious. And if their testimony is true, some of that family had convincing proof of such relation, and Eick and the testator knew it. The family had remonstrated against this association, and there had been some dissension. The attorney who drew the will dictated it, probably from memoranda, when alone to his typist. He had been the attorney for Eick in a litigation, but it does not appear that he had ever acted for the testator. Eick had been in that attorney's office several times in a short period before the execution of the will. The attorney, with the will drawn, attended the testator at her house. His typist accompanied him as one subscribing witness, and Eick had called in his friend Frey as the other. The will was executed in the presence of the two witnesses, the attorney and Eick. The attorney told Graf, a son of the testator, that the will had been drawn in the attorney's office, and that the testator had come there with Eick and Frey a few days before the execution. The typist, who had been employed there three years, testifies that she had never seen the testator before the day of the execution.

But assume that the jury inferred that Eick had his attor-

ney draw the will, even without conveying any instructions from the testator, that the attorney never saw the testator until the day of its execution, and that the subscribing witnesses were this typist and this friend of Eick's, yet, as I have said, the jury were satisfied that the testator was of testamentary capacity and that she duly executed the will. And the law does not require that the making of the will should originate with the testator provided he intended it as his own will and understandingly adopted it. (Schouler Wills [5th ed.], § 233; *Coffin* v. *Coffin*, 23 N. Y. 9.) The testator's disregard of those of her blood, to prefer a stranger, did not establish the latter's undue influence. Her meretricious relation with him, if established, did not condemn the will, although it required careful scrutiny of the circumstances of execution. (*Matter of Mondorf*, 110 N. Y. 456; *Main* v. *Ryder*, 84 Penn. St. 217.) On the other hand, such relation did afford some explanation of her selection of Eick as her beneficiary, even though affection had an element of sensuality. The testator was not ill, but appeared well. She lived after the execution for almost a year, "and every day of that period was an affirmance of its [the will's] provisions." (*Matter of Coleman's Estate*, 185 Penn. St. 437, 442.) It is true that the execution was marked by secrecy, in that all were excluded save Eick and those persons whom I have mentioned, of whom all were naturally friendly to Eick save the typist, who herself was an employee of the said attorney. And as there is no proof that this "secrecy" was at the instance of the testator, it was a circumstance to be considered. But, even so, there is no direct proof that Eick had excluded any person, and it was entirely natural that if the testator herself had decided upon the disposition made of her property, she would not desire the attendance of any of her family.

There is no proof that Eick, at the time of the execution, by word or action controlled or directed the testator. And there is this circumstance that strongly makes against any domination. After the will had been read, translated into German and re-read to the testator, she said that she wished to give $1,000 to her granddaughter and it "was not in her will," whereupon the necessary materials were sent for and the codicil

that contained such a bequest was drawn and executed. The fact that in such *entourage* and under the eye of Eick the testator directed action that deprived him of one-sixth of the estate, negatives the idea of his control. There is no proof to indicate that this incident was a comedy of a conspiracy. The cunning that would conceive it would have rather directed the benefaction of the son or daughter, both adults, than of a grandchild.

Of course, the jury could find a motive, and of course the association of the testator and of Eick afforded to him opportunity. But that is not enough. His importunity, if made, did not succeed against any one who, so far as the proof shows, was dependent upon the testator. There is no proof that shows, even by inference, the exercise of any control by Eick over the testamentary act. There is none to indicate that the testator was his puppet so that any act of hers was due to his dominance or his control that enabled him to teach her, in advance of any act, her lesson of absolute obedience to his will and against her actual will.

In the absence of sufficient proof, is there not reason for surmise that the jury was carried away by its desire to make a will such as they thought the testator should have made, upon the supposition that if Eick influenced her to prefer him and to disregard those of her blood, there was influence that was "undue" and that permitted the jury to set things right according to their own ideas ? This testamentary disposition by verdict was not due to any omission of the learned surrogate to instruct the jury upon the law, for his charge and his rulings are entirely commendable.

I advise that the decree of the Surrogate's Court of Kings county be reversed and a new trial be ordered upon the issue of fraud and of undue influence, costs to abide the final event.

STAPLETON, MILLS and RICH, JJ., concurred; CARR, J., not voting.

Decree of the Surrogate's Court of Kings county reversed, and new trial ordered upon the issue of fraud and of undue influence, costs to abide the final event.