# Matter of Proving the Last Will and Testament of Ella G. Prentice, Deceased.

### (Surrogate's Court, Bronx County, February, 1920.)

Wills — execution of — undue influence — subscribing witness —, probate — evidence — incompetent persons — Code Civ. Pro. § 2323-a.

Where one of the subscribing witnesses to a will is an attorney, there is a presumption that the formalities of execution were complied with.

An allegation that the execution of a will was procured by the exercise of undue influence upon the testatrix is an affirmative assault upon the validity of the instrument and the burden of proof remains upon the party who asserts such undue influence.

Undue influence imports coercion and must be such as substitutes for the wishes and desires of the testatrix those of the one exercising the influence so that the instrument does not in fact express the will of the testatrix but that of such other person.

Mere opportunity to exercise undue influence in such a case does not of itself warrant an adjudication that it was availed of, nor can the influence of feelings of gratitude to a beneficiary for kindness shown be regarded as undue influence.

In a proceeding for the probate of an instrument purporting to be a last will executed by the alleged testatrix in January, 1919, at the age of seventy-three, it appeared that most of the time between 1900 and 1909 she had been confined in private sanitariums and upon being removed to the Middletown State Hospital remained there until April 5, 1915, when without the knowledge of one of her two daughters, who in February, 1915, upon the application of the superintendent of the hospital had been appointed the committee of the person and property of decedent and was still acting as such, decedent was paroled in the custody of her other daughter with whom she resided from January, 1916, to the time of her death. Upon denying probate on the ground that proponent, the other daughter of decedent, had not sustained

the burden of showing that the alleged testatrix was of sound mind and memory at the time of the execution of the alleged will, *held*, that the order appointing the committee under section 2323-a of the Code of Civil Procedure, while not conclusive, was *prima facie* evidence of the incompetency of the alleged testatrix at the time said order was made; that it would be assumed that in the proceedings on the commitment to the state hospital all the steps required were regularly taken; that decedent had been duly committed according to law and that she was detained as an inmate of the hospital by virtue of a valid order of commitment.

The evidence showing that decedent was incompetent to manage her affairs at the time she was committed to the state hospital, a presumption of continuance of incompetency arose subject to being rebutted by evidence clear and satisfactory tending to show that when the alleged will was signed by decedent she had sufficient mental capacity to execute it either because she had recovered or because the instrument was executed during a lucid interval.

PROCEEDINGS on the contested probate of a will.

Joseph P. Hennessy (Hartley G. Pelletier, of counsel), for proponent.

Reiley & Harrison, for contestant.

SCHULZ, S. The decedent died on the 4th day of February, 1919. It is alleged that on January 31, 1919, at the age of seventy-three years, she executed an instrument which is now propounded as her last will and testament. She left her surviving as her only heirs at law and next of kin two daughters and one son, and by the terms of the propounded paper all of her property which remains after the payment of her debts and funeral expenses is bequeathed and devised to one of her daughters, the proponent herein. The latter is also nominated in the document as the executrix of the same, with the provision that she shall not be

Surrogate's Court, Bronx County, February, 1920. [Vol. 110.

required to give bonds for the faithful discharge of her duties as such.

The son of the decedent has not appeared in the proceeding and has taken no part therein except that he has testified as a witness called by the proponent. The other daughter of the decedent interposed an answer containing objections which, in addition to the usual allegations, contained one to the effect that the decedent was at the time of her death a resident of the county of New York. It appeared that the intention was to challenge the jurisdiction of the court by the last named objection. Upon the hearing, however, counsel for the contestant withdrew the same, so that I am proceeding on the assumption that it is no longer contended that this decedent was not a resident of the county of Bronx and that it is conceded that I have full jurisdiction in the matter at issue.

Upon the testimony produced before me I am satisfied that the factum of the document has been established. The proceedings attending its execution are testified to by three witnesses, one of whom is an attorney of many years' standing, which of itself has been held to create some presumption that the formalities of execution were complied with. *Matter of Cottrell,* 95 N. Y. 329; *Matter of Nelson,* 141 id. 152, 157; *Wyman* v. *Wyman,* 118 App. Div. 109; affd., 197 N. Y. 524; *Matter of Kenney,* 179 App. Div. 258, 261. As to the allegation of undue influence being "an affirmative assault on the validity of a will, * * * the burden of proof does not shift, but remains on the party who asserts its existence." *Matter of Kindberg,* 207 N. Y. 220, 229; *Matter of Ruef,* 180 App. Div. 203; affd., 223 N. Y. 582. Mere opportunity to exercise undue influence does not of itself warrant an adjudication that it was availed of. *Cudney* v. *Cudney,* 68 N. Y. 148; *Post* v. *Mason,* 91 id. 539; *Matter of Fleischmann,* 176

App. Div. 785; *Lester* v. *Lester,* 178 id. 438.   The influence of feelings of gratitude to the beneficiary for kindness rendered is not undue influence.   *Children's Aid Society* v. *Loveridge,* 70 N. Y. 387; *Marx* v. *McGlynn,* 88 id. 357; *Matter of Mondorf,* 110 id. 450; *Matter of Brand,* 185 App. Div. 134, 144.   It must be an influence which substitutes for the wishes and desires of the decedent those of the person exercising the influence so that the disputed document does not in fact express the will of the decedent, but of the former.   It imports coercion.   *Matter of Van Ness,* 78 Misc. Rep. 592, and cases cited; *Matter of Fleischmann, supra; Matter of Powers,* 176 App. Div. 455.   In the pending matter the contestant has not sustained the burden thus upon her by a fair preponderance of the evidence.

There remains then to be considered the final and the most seriously contested issue, whether or not the decedent at the time of the execution of the instrument had testamentary capacity.

It appears from the evidence produced that the decedent, her husband and three children resided together until the proponent was between seventeen and nineteen years of age, and that thereafter the decedent, her husband and her remaining two children constituted the household until about the year 1900, when the decedent was removed to a sanitarium at Hornellsville, N. Y.   The testimony is that she remained there some time and then came home, one of the witnesses stating " as the doctor said, cured."   Thereafter she continued to reside with her husband and her two children until 1904, when she was removed to a sanitarium at Stamford, Conn., where she remained until the year 1909.   From Stamford, Conn., she was removed to the Middletown State Hospital at Middletown, N. Y., where she remained until the 5th day of April, 1915.

Surrogate's Court, Bronx County, February, 1920.    [Vol. 110.

The contestant was married in the year 1912, and her father, the husband of the decedent, thereafter lived with her and her husband, and departed this life on the 7th day of May, 1914, after his wife had been taken to Middletown and while she was still an inmate of the hospital. On the 13th day of February, 1915, by an order made at the Special Term of the Supreme Court, county of Orange, and entered in the office of the clerk of that county, the contestant was appointed the committee of the person and property of the decedent upon the application of the superintendent of the Middletown State Hospital and continued so up to the time of the decedent's death. On the 5th day of April, 1915, the decedent, without the knowledge of her committee and without any notice to her committee, was paroled in the custody of the proponent and by her taken from the institution in question to New York city. Thereafter, and on April 9, 1915, the proponent and her husband called upon the contestant and her husband and advised them to that effect, but refused to disclose the decedent's address. About four days thereafter a nurse from the hospital came to the home of the proponent for the purpose of taking the decedent back to the hospital at Middletown, and thereupon the proponent admits that through a subterfuge she succeeded in getting her mother out of the house and removed her out of the state and to the city of Boston, where she was operated on for cataract and subsequently to the state of Pennsylvania, where she remained for from six to seven months. After this she returned to the city of New York, and on or about January 27, 1916, she was brought to the premises in this county where she continued to reside up to the time of her death. Such, in brief, is the history of the last nineteen years of the life of this unfortunate woman.

For the purpose of analysis the evidence produced
may be roughly divided into that as to alleged occur-
rences (a) between 1900, the year when she first
entered a sanitarium, and the 5th day of April, 1915,
when she was paroled in the custody of the proponent;
(b) between April 5, 1915, and the 1st day of January,
1919, when she entered upon the illness which
ultimately resulted in her death, and (c) between the
1st day of January, 1919, and the 4th day of February,
1919, the date when she died.  There is no evidence
before me to show under what circumstances the
decedent became an inmate of the sanitarium at Hor-
nellsville.  As to the sanitarium at Stamford, the testi-
mony is that her husband placed her there, but no
evidence of a commitment by any court has been
produced.  Nor is the commitment, by virtue of which
she was transferred to the state hospital at Middle-
town, in evidence.  The fact, however, that she was an
inmate during the various times that I have stated is
not disputed.

There is no evidence of her condition at the time
that she was at the sanitarium at Hornellsville.  As to
her condition while at Stamford, one witness testified
he had been a consulting surgeon at the sanitarium in
question and had seen the decedent at the sanitarium
at least once a year during the time that she was there.
He states that she was suffering from manic depres-
sive insanity, testified to her actions, conversation
and conduct by which the disease manifested itself, and
which it is not necessary for me to detail here, and
gives it as his opinion that patients suffering from the
ailment in question might for a number of years have
a normal condition, but that in the decedent's case she
was suffering from the maniacal form in which a
mental deterioration with considerable weakening of

Surrogate's Court, Bronx County, February, 1920. [Vol. 110.

the mind occurs and the patient passes into a state of "childlike simplicity." Her condition while in the Manhattan State Hospital is testified to by the husband of the contestant, who is a physician, and by a nurse who attended her while in that institution, and without stating the harrowing details testified to, it seems clear that her condition while at Middletown was practically the same as that while at Stamford. While it may be urged that the husband of the contestant may, by reason of that relationship, be an interested party, no such contention may be made as to the nurse.

The order appointing the contestant the committee of the person and property of the decedent hereinbefore referred to, dated February 13, 1915, was entered in a proceeding brought by the superintendent of the Middletown State Hospital while she was an inmate there, under the provisions of section 2323-a of the Code of Civil Procedure after notice given to the decedent personally, to her daughter, the contestant, and to the superintendent, stating the time when the application would be presented to the court. It recites, among other things, that the decedent was duly committed to the hospital in question as an incompetent person on the 17th day of May, 1909, and it then provides that the contestant "be and she hereby is appointed committee of the person and estate of the said Ella G. or Ella B. Prentice, who is an incompetent * * *." Upon this order a commission was duly issued to the committee in question.

While it was stated in *Matter of Barney,* 185 App. Div. 782, 796, that: "The commitment was *ex parte* and was, therefore, not an adjudication or competent to show that she was insane at the time," the alleged incompetent in that case had been committed by two police justices in 1860, and it appears that no commit-

tee had been appointed, nor had proceedings been taken similar to those provided by section 2323-a of the Code of Civil Procedure, which had not as yet become the law. The court, however, further stated that it was undoubtedly competent to show that the testatrix had been so confined in the asylum, and the jury might fairly infer therefrom that during that time she was of unsound mind, for apparently there was no effort on her part or on the part of her husband and relatives to obtain her release from the asylum.

The proceeding under section 2323-a of the Code was constitutional. *Matter of Walker,* 57 App. Div. 1; *Sporza* v. *German Sav. Bank,* 192 N. Y. 8. The order appointing the committee, while not conclusive evidence of the incompetency of the testatrix, was nevertheless *prima facie* evidence of such incompetency at the time that it was made (*Hart* v. *Deamer,* 6 Wend. 497; *Matter of Coe,* 47 App. Div. 177; *Matter of Widmayer,* 74 id. 336; *Rider* v. *Miller,* 86 N. Y. 507; *Schoenberg & Co.* v. *Ulman,* 51 Misc. Rep. 83), and this is true, in my opinion, whether the order appointing a committee was made after a hearing before a jury in the nature of a proceeding *de lunatico inquirendo* or after proceedings brought under section 2323-a of the Code. The court would have had no authority to appoint a committee unless the person in question was incompetent. As was said in *Matter of Walker, supra:* "The theory of these provisions seems to be that the question of incompetency may, in the discretion of the court of justice, be regarded as sufficiently determined by the original commitment to a State institution, and his remaining still an inmate thereof."

No claim was made in the present proceeding that there was any irregularity in the commitment, and while the trial fails to disclose the proceeding upon

the commitment to the state hospital, as was also the case in *Sporza* v. *German Sav. Bank, supra,* I think it may be said here, as it was in that matter, that we must assume that all the steps required by that statute were regularly taken, and that she was an inmate of the state hospital duly committed according to law, and as stated in *City of New York* v. *Brinckerhoff,* 63 Misc. Rep. 445: " It must be assumed that the incompetent is detained at the asylum by virtue of an order of commitment."

We have, then, the testimony of the three witnesses referred to as to her condition at Stamford and at Middletown, which stands uncontradicted, and establishes to my satisfaction that the decedent was insane during the time she was at Stamford and Middletown prior to February 13, 1915, and we also have the order appointing her committee which is *prima facie* evidence, not in any way rebutted, of her incompetency on said last mentioned date, and leads me to the conclusion that she was incompetent to manage her affairs at that time.

Having reached the conclusion that such a condition has been established, a presumption of its continuance arises subject to being rebutted by evidence showing that when the document was signed she had mental capacity to execute it either because she had recovered or because it was so executed during a lucid interval, but such evidence should be clear and satisfactory. *Matter of Widmayer, supra,* citing *Delafield* v. *Parish,* 25 N. Y. 9; *Rollwagen* v. *Rollwagen,* 63 id. 504; *Cook* v. *Cook,* 53 Barb. 180; *Matter of Van Den Heuvel,* 76 Misc. Rep. 137, 148.

The conceded acts of the proponent in obtaining the parole of her mother and moving her from place to place, without notice to the committee, of whose appointment she had been advised; in placing her to

board with a family in this county, without informing
her committee of her whereabouts, and finally, in pre-
venting the latter from seeing the decedent until
February 2, 1919, two days after the will had been
executed and she was *in extremis,* were injudicious
if not improper. It may be that they were due to a
generous and humane impulse to save her mother
from being returned to the asylum, and the evidence
would seem to bear this out, but if her mother had in
fact recovered, she could have prevented the con-
summation of the acts she feared by some proceeding
in the nature of a supersedeas to have the commit-
tee discharged. In fact, it appears that two proceed-
ings were brought with this object in view after the
contestant had obtained possession of the person of
the decedent, and that both failed. I will not ascribe
selfish motives to the proponent in obtaining the
parole of the decedent, for there is no evidence that
she ever tried to induce her mother to make a will,
and her acts in providing for her, while apparently
unnecessary, the decedent having property and a duly
appointed committee charged with that duty, showed
a filial affection which arouses admiration; but that
her acts as above recited cast a suspicion on the
whole matter which warrants close scrutiny cannot be
successfully controverted. It was also most ill-advised
for the authorities of the hospital in question to parole
an inmate in the custody of the proponent without
notice to her committee, and a practice which should
not be encouraged or followed.

As to her condition between April 5, 1915, and Janu-
ary 1, 1919, the evidence is very voluminous, and it
would be impracticable and unprofitable to quote
therefrom at length. Some witnesses state that she
read the papers and conversed with them practically

Surrogate's Court, Bronx County, February, 1920.    [Vol. 110.

up to the day when she was stricken with her last illness, and that she sewed, attended to household duties and did all other acts which a normal, intelligent woman of her age could do, and several letters in her handwriting are in evidence and appear to be intelligently composed. Other witnesses testify that she was quiet, unresponsive, did not answer questions when put to her, did not enter into conversations when addressed by them, did not reply to neighbors, and that they never saw her read or sew. From all of this evidence it is rather difficult to arrive at a satisfactory conclusion as to just what her condition was after leaving the hospital and prior to the 1st day of January, 1919, when for the first time after her last return to New York city, so far as the evidence discloses, a physician attended her, although I think it is evident that she had improved very much since the time testified to by the nurse from Middletown.

We now come to the last or final period, beginning with January 1, 1919, and ending with her death. Three physicians attended the decedent at various times during that period. One of these was the family physician of Mrs. Donahay, with whom the decedent boarded, and of the latter's daughter. He had been summoned by her and called on decedent for the first time on January 1, 1919. He testified that he found her in bed, helpless and semi-conscious; that she could only be aroused by thorough shaking; that he spoke to her but could elicit no reply except that she turned her head and opened her eyes; that on January seventh he called again and found her in practically the same condition, except that upon one or two occasions, when Mrs. Donahay asked her a question she said "yes." This, he says, she could not have done on his first visit. On January twentieth he called again, and for

the last time; he then found her practically in the same condition, but seated in a chair. She could only answer yes or no, and when he asked her how she felt she stared blankly, but when Mrs. Donahay spoke to her and asked her whether she felt better she said yes. The witness stated that he did not know the history of the patient, but diagnosed her ailment as senility, arterio sclerosis and sclerosis of the brain, and that she impressed him as irrational. He further testified that she was indifferent, apathetic, and that she was like a very young child. The witness admitted that he knew the husband of the contestant, a physican, but only in a professional capacity. It appeared that the latter was in the habit of administering the anæsthetic when the surgeon who operated for the witness was performing major operations, and that the witness had been present on numerous occasions of this kind and had thus met him in the operating rooms of the hospitals, but that there was no social relationship existing between them. This witness had attended the daughter of Mrs. Donahay, who was very friendly disposed to the proponent, up to within five or six days of the date upon which he was testifying.

The last physician who attended the decedent was also unacquainted with any of the parties, and I believe unacquainted with Mrs. Donahay and her daughter, and was called because their family physician aforementioned could not be reached. He testified that he attended her on January thirty-first after midnight, which, it will be observed, was the day or immediately after the day on which the will was drawn, and from that time until her death. He stated that on that occasion she had a quick pulse and suffered from paralysis of the bowels; that he did not take her tem-

Surrogate's Court, Bronx County, February, 1920. [Vol. 110.

perature because her mouth was open; that she did not speak; that she responded to what she was asked to do, such as showing her tongue and trying to turn over; that when she was spoken to she murmured and that witness could not understand what she said, but that people in the house told him what it was. He further testified that he called on the following day and found the heart more regular; that he asked her questions which she did not answer; that she then had a temperature of 103 degrees; that her death was due to hemiplegia and senility, and that hemiplegia is paralysis of the body, or part of the body, and was caused by a bursting artery in the brain; that he did not examine her as to her mental condition, and that her physical condition might have existed for a few moments or a few hours.

Another medical witness, Dr. Stern, said that he saw her some time between January twenty-eighth and January thirty-first, but it was subsequently conceded that the correct date was January 25, 1919; that he is the personal physician of the proponent, and was asked by her to examine her mother; that she sat in a chair in the parlor; that her answers were monosyllabic, but that she gave relevant answers; that she said yes or no to all questions; that she appeared to be normal, no paralysis, spoke hesitatingly, but he could hear her clearly; that she appeared to be absolutely rational; that he did not examine her as to her mental trouble, and that her difficulty at that time was an intestinal condition. This physician attended her only once.

The testimony as to the preparation of the will may be briefly summarized as follows: On the 29th day of January, 1919, two days before the will was signed, the decedent having stated that she wished to write something, an attorney who resided in the neighbor-

Misc.]    Surrogate's Court, Bronx County, February, 1920.

hood, and was unknown to any of the parties, was summoned to prepare her last will and testament. He called at the house, but did not draw the document at that time; why, does not clearly appear. On the evening of the following day an attorney, who was associated with the one first summoned, attended at her home, saw the proponent and was advised by her that she thought that the decedent was too ill to see the witness; that he eventually saw the decedent, questioned her as to her age, birthplace, children and property, and her wishes as to the disposition of the latter, to which she answered briefly, and that in answer to his question as to what she wished to do with her property, she said " *Pline* " (proponent's name is Pauline), and that in reply to his question, " Don't you want the other daughter or son to get anything? " she said, " No." The attorney then testified that he said, " Well, if I draw such a will as that, will it be what you want? " and that the decedent then " stopped, shut up;" that he noted that she was very tired, and suggested that he come back the next day, to which she acquiesced. The following day he called again, and it was on that occasion that the paper was executed, after he had read it aloud to her. It appears that the decedent at that time volunteered nothing, and was taciturn and monosyllabic in the replies she made, but that while her speech was low and muffled, he could understand her. The witness again interrogated her with reference to the matters as to which he had questioned her on the previous occasion, and her answers, as stated by him, appeared to be in accordance with the facts as developed upon the trial, which was true largely also as to inquiries put to her about her property.

An examination of the physical appearance of the testatrix's signature discloses that while a part of the

Surrogate's Court, Bronx County, February, 1920.    [Vol. 110.

name, to wit, " Ella G." and the letter " P," being the first letter of her last name, are quite legible, the writing which follows the letter " P " is an unintelligible scrawl. The testimony is that while she was subscribing the instrument, and had proceeded with the writing to about the middle of her last name she hesitated, and that then the attorney, who was superintending the execution of the document, asked her if he had spelled the name right, whether it should be " t-i-c-e " or " t-i-s-s." She answered " t-i-c-e " and completed her writing.

It is evident that the will was not prepared after a conference of any length between the decedent and the scrivener, and while the latter, a reputable attorney favorably known to the court, whose testimony I believe, undoubtedly did his best under the unfortunate conditions prevailing to ascertain by the questions put to the decedent whether or not she was competent, and honestly and conscientiously reached the conclusion that she was, he of necessity did so without any prior acquaintance with her.

It is urged that the decedent was angry at the contestant because she believed the latter was responsible for having sent her to Middletown, and that after the proponent got her out she was in great fear lest the contestant put her back. There is no evidence that she was induced to this belief by the proponent, but there is evidence that the proponent herself believed, or at least said to one of the witnesses that she believed that her sister was responsible for putting her mother in an insane asylum.

I have no doubt that in decedent's unfortunate mental condition she did believe that her committee was antagonistic to her and felt correspondingly kindly toward the daughter who took her out of the institution and who showed her kindness and attention which

her committee could not do if so inclined, because her whereabouts were concealed from her by the proponent. I do not consider this state of her affections, however, if it was so, as necessarily indicative of rationality. On the contrary, if she was again of sound mind the courts were available and a judicial determination to that effect could have been obtained and her committee discharged.

Section 2614 of the Code of Civil Procedure provides that before admitting a will to probate the surrogate must be satisfied with the genuineness of the will and the validity of its execution, and that it must be admitted to probate if among other things it appears that the testatrix was in all respects competent to make a will. The burden of showing that the testatrix was of sound mind and memory at the time of the execution of the will is upon the proponent. Code Civ. Pro. § 2614; Decedent Estate Law, § 21, Laws of 1909, chap. 18, and constituting chapter XIII of the Consol. Laws; *Matter of Goodwin,* 95 App. Div. 183; *Matter of Schreiber,* 112 id. 495; *Matter of Lissauer,* 5 N. Y. Supp. 260; *Matter of Gedney,* 142 id. 157; *Rollwagen* v. *Rollwagen, supra; Matter of Cottrell, supra; Matter of Martin,* 98 N. Y. 193, 196. In the pending matter, after a careful review of the evidence, I reach the conclusion that this burden has not been sustained and that in consequence probate must be denied.

The motion to dismiss the objections made at the close of the case upon which I reserved decision is denied as to the objections to the effect that the propounded paper is not the last will and testament of the decedent and that the decedent did not have testamentary capacity, and granted as to the remaining objections and an exception awarded to each party as to so much of the ruling as is adverse to her.

Surrogate's Court, New York County, February, 1920.   [Vol. 110.

The motion to deny probate made at the same time, upon which decision was also reserved, is granted and an exception awarded to the proponent.  Costs to be taxed on notice will be awarded to the proponent and the contestant under the authority vested in me ·by section 2746 of the Code.

Decreed accordingly.