John J. Dillon, S.
This is a contested probate proceeding, tried by the court without a jury. The decedent died on June 4, 1960, at the age of about eighty-five. The instrument offered for probate had been executed on August 19, 1958, and was the last of some 13 testamentary documents, both wills and codicils, known to have been made by the decedent since 1942. The validity of the 1958 will is challenged by Mildred T. Lefferts, the decedent’s niece and sole distributee. At the time of the making of the will offered for probate the testator was a childless widower, and the niece was his nearest relative. He was a man of large means and for many years had maintained an apartment in New Rochelle, New York, and a home in Westerly, Rhode Island. The paper offered for probate was executed at the office of the Washington Trust Company in Westerly and described the testator as a resident of that town in the State of Rhode Island. The decedent died, somewhat less than two years later, in New Rochelle, leaving the bulk of his property within the State of New York.
The scheme of the 1958 will may be briefly summarized: The testator (1) left all his real property and tangible personal property to the niece: (2) left $10,000 to Carreña B. Spencer, described as a friend of himself and his deceased wife; (3) left relatively modest amounts, aggregating $6,500, to a cemetery and to three named individuals; and (4) left the entire residue in trust, with income to the niece for life and the remainder upon her death to the Westerly Hospital as a memorial to his wife. If the niece had predeceased the testator the hospital would have taken the residue outright. The Washington Trust Company was named as executor and trustee. The gross estate is estimated in the petition at $1,800,000. The great bulk of this large sum, after taxes and administration expenses, will pass under the residuary clause if the will is upheld, with the income to the niece for life and the principal passing thereafter to the hospital. Under the last preceding will, made on October 9, 1956, the contestant would take the residue outright, with only a $10,000 bequest to the Westerly Hospital.
Of the four objections filed, the first may be readily disposed of, since it does not appear to have been pressed, and in any event it has been negatived by the proof. The objection is that *596 the testator did not declare the instrument of August 19, 1958 to he his last will and testament. Publication is not required by the laws of Rhode Island (General Laws of Rhode Island, tit. 33, ch. 5), where the will was executed. The subscribing witnesses nevertheless testified that the decedent did in fact declare the instrument to be his will, and there is no evidence to the contrary. The first objection is therefore dismissed.
The second objection raises an issue as to the decedent’s testamentary capacity. The third alleges fraud and undue influence on the part of one George P. Ward and “ some other person or persons ” — the latter being identified in the bill of particulars as six named individuals and the Washington Trust Company. The fourth objection alleges that the decedent did not understand the instrument and executed it by mistake. It seems clear that this objection is repetitious of the claim of testamentary incapacity set forth in the second objection, or of the charge of fraud and undue influence contained in the third. These are the two issues to be determined by the court.
Inasmuch as the contestant argues that the 1958 will involved a “ major change * * * from a plan of testamentary disposition adhered to over many years,” it may be helpful to refer to Mr. Lefferts’ previous wills. His wife died in April, 1955. The record contains 5 wills made prior to her death. In every one of those wills the testamentary provisions for the wife were similar to those made in 1958 for the niece, that is to say: the wife received either a life estate in or the absolute ownership of the real estate, received all the tangible personal property, and was named as sole income beneficiary of a residuary trust comprising the major portion of the estate. Under the first 4 of these wills the niece received a $5,000 legacy and 75% of the remainder of the residuary trust. In the fifth will, made on July 2,1953, she received the entire remainder, but subject to a broad power of principal invasion at the option of the wife during her lifetime. Thus in all these wills the testator was primarily concerned with providing for his wife, and secondarily with his niece. It should be noted also that in the last 3 of these wills the Washington Trust Company was named as one of the executors and trustees.
Necessarily the testamentary plan was changed after the death of decedent’s wife in 1955. On August 18, 1955, Mr. Lefferts made a will in which his niece was given the entire residuary estate outright. It is evident that she had now become the principal object of the testator’s concern. This was the first will containing no trust provisions. The Washington Trust Company was again named as one of the executors, there being *597 no trustee. But by 1956 the decedent had begun to entertain some doubt about the wisdom of leaving so large a sum to his niece without restriction. In April, 1956, he consulted a lawyer named Franchot and instructed him to prepare a new will leaving the residue in trust, with the niece receiving the income for life and a power of appointment over the remainder. Mr. Franchot drafted a will in accordance with these instructions, and sent it to his client. But before executing it the decedent changed his mind. He told Mr. Franchot to eliminate the residuary trust and provide for an outright bequest of the residue to his niece, explaining that if she chose to ‘ ‘ dissipate the property that was her business.” A new Avill was accordingly drafted and executed on May 15, 1956, in accordance Avith the changed instructions. The Industrial National Bank of Providence was substituted for the Washington Trust Company as one of the executors. In this will the Westerly Hospital made its first appearance. Mrs. Lefferts had had her last illness and had died in that institution. The hospital Avas given a $10,000 bequest “as a memorial to my late wife,’’ and was named also as alternate legatee of the entire residue if the testator’s niece failed to survive him. In this connection the decedent explained to Mr. Franchot that he felt “ very kindly ” toAvard the hospital.
A feAv months later Mr. Lefferts again decided to change his Avill, and a new document prepared by Mr. Franchot Avas executed on October 9,1956. It differed from the previous will only A¥ith respect to legacies to certain employees. In the contestant’s view this was the last valid Avill, and we therefore come to the instrument of August 19, 1958, now presented for probate, the provisions of which have already been summarized. The differences between that instrument and the prior will made in October, 1956, are chiefly: (1) the substitution in the residuary clause of a trust for the niece’s benefit, Avith remainder to the Westerly Hospital, in place of an outright gift; and (2) the reinstatement of the Washington Trust Company as fiduciary, in place of the Industrial Bank of Providence.
In all this testamentary history of 16 years, in Avhich Mr. Lefferts made 9 Avills (the codicils being unimportant), the court cannot detect the kind of major change described by the contestant. The decedent actually wound up with a will differing in no important respect from the very first. A marked change took place only in 1955 and 1956, when Mr. Lefferts made 3 wills, in all of which he bequeathed the residuary estate outright. In 1958 he returned to the sort of residuary disposition which he had uniformly followed during his Avife’s lifetime, simply substituting the niece for the wife as income beneficiary, and the *598 hospital for the niece as remainderman. There was no such “hostility to previous testamentary provisions ” as the courts considered important in Delafield v. Parish (25 N. Y. 9) and Tyler v. Gardiner (35 N. Y. 559). No doubt the change in the residuary clause in the 1958 will is of major importance to the contestant, but to the testator himself there was nothing novel about a residuary trust.
The proof on the issue of testatmentary capacity may be summarized as follows: In 1958 the decedent was about eighty-three years of age. It had been his custom to spend the Winter months in New Rochelle and to live at Westerly from about May to October. In both places he had a doctor who saw him at fairly regular intervals. Dr. Wallace Krugler, a general practitioner, had been the decedent’s doctor in New Rochelle for many years. Physical examinations of Mr. Lefferts made by Dr. Krugler in the Spring and Fall of 1957 had shown a man in generally sound physical condition except for an inguinal hernia and a tendency to walk with a shuffling gait. He was then complaining that his memory was poor, and in December, 1957, the doctor noted that he was having ‘ ‘ senile changes. ’ ’ Through the early months of 1958 the same conditions continued. In June of that year he left for Westerly and Dr. Krugler saw no more of him until he returned to New Rochelle in October. The disputed will was made during the interval.
The decedent’s physician in Westerly was Dr. Joseph L. 0. Ruisi, also a general practitioner. He testified that he made a physical examination of Mr. Lefferts on June 8, 1958, and found him perfectly normal except for an attack of colitis. In the latter part of June the decedent developed a phlebitis in the right leg, which required his confinement to bed for the next 10 days. By early July he had sufficiently recovered to visit the doctor at his office. An examination of the decedent at his home on July 17 resulted in “essentially normal findings.” The doctor found nothing significant when he visited Mr. Lefferts on August 8, 14 and 18. The will was executed on August 19. From about July 1, after recovering from the phlebitis attack, the decedent had been up and about, went to town by automobile and walked about the streets. Dr. Ruisi testified that he walked with a forward leaning and that his gait might have slowed up, but that he picked his feet up. Through the year 1958 the decedent had taken various medications, including tranquilizers, prescribed by both doctors. During that Summer Dr. Ruisi talked to bim on many subjects such as current events, investments and hobbies, and found his conduct and conversation rational. He read the newspaper daily and was particularly interested in tbo *599 stock market quotations. Dr. Buisi saw no evidence that his patient’s memory was failing.
The foregoing is the substance of the medical testimony. The contestant also called a Dr. Lawrence I. Kaplan, a phychiatrist who had never seen the decedent, but his testimony is without probative value (Matter of Burnham, 201 App. Div. 621, affd. 234 N. Y. 475; Matter of Loehr, 187 App. Div. 957). Numerous lay witnesses were called on both sides who had observed the decedent and talked to him in or about the year 1958. Some of these considered him irrational, and a greater number said he was rational. Their testimony cannot be summarized without extending this decision to unreasonable lengths. The court finds that the preponderance of such evidence is on the side of the proponent. There is a marked tendency in this type of case to overemphasize the significance of isolated events, to add together a number of such occurrences, and then to draw the conclusion of mental incapacity while ignoring the whole body of evidence to the contrary. The proper conclusion can best be reached by applying well-recognized standards; but before doing so it will be appropriate to review the events leading up to the making of the disputed will.
The fact has already been mentioned that the Washington Trust Company had been named by the decedent as fiduciary in 4 successive wills made both prior to and after his wife’s death. In the will of May 15,1956, the Washington Trust Company was replaced by the Industrial National Bank. Mr. Lefferts had become irritated with the former because as executor of wife’s estate it had refused payment of a claim for reimbursement of moneys expended in the wife’s behalf. But he continued to maintain safe-deposit boxes in both banks, and apparently resumed friendly relations with Mr. Ward, trust officer of the Washington Trust Company, as appears from a cordial letter he wrote to Ward on May 1,1958. On July 28,1958, Mr. Leiferts called on Ward at the bank. He told Ward that he had gone to Industrial to remove his securities from his safe-deposit box and had been told by the manager that he could not do so. He also told Ward that he wanted to make a new will, eliminating his niece as a legatee and reinstating the Washington Trust Company as executor. Ward says he told the decedent he could not believe that he really wanted to eliminate the niece, who was his only relative.
A few days later, on August 2, Mr. Leiferts telephoned Ward and asked him to call at the house. Ward went to the Leiferts ’ home, where the decedent’s friend Boyd was also present. Mr. Leiferts was still concerned about the removal of his securities *600 from the box at Industrial. He told Ward on this occasion that the manager of Industrial had spoken about a problem which would be created if the securities were taken outside the State. On August 4 the decedent and Boyd called on Ward at the bank, and was told that if he wanted his securities all he had to do was go to Industrial and get them; whereupon he and Boyd left, and returned in a short time with the securities. They were placed in a box at the Washington Trust Company. The decedent then mentioned his will, and it was arranged that he would look for the 1956 will and either amend it by a codicil or execute a new one. Two days later Mr. Lefferts again called on Ward, saying that he had located the 1956 will and wanted to destroy it. He was told that he ought to engage an attorney. On this occasion Ward pointed out to the decedent the sizeable tax saving that could be effected if the residue were left in trust Avith the remainder to a charity. It was arranged that the matter would be discussed in further detail. The tax advantages of the charitable remainder were discussed again on August 12, at which time the decedent said he Avas interested only in the Westerly Hospital. Prior to this date the decedent had gotten a list of five local lawyérs from Ward and had chosen James T. Thornton, Jr., because Mr. Boyd said he knew him. He instructed Ward to contact Thornton and arrange for a meeting. Ward met with the decedent again on August 13. Ward in the meairwhile had computed that a tax saving of between $136,000 and $152,000 Avould be effected by leaving one half of the residue in trust with remainder to the Westerly Hospital, and leaving the other half of the residue to the niece outright. Mr. Lefferts’ answer was that he did not want his niece to get the bulk of his estate. It was arranged that the decedent and Ward would meet with Thornton on Friday, August 15. In describing this meeting, Ward testified in part as follows: ‘ ‘ Mr. Lefferts stated at that time that his niece had ignored him, had failed to show any appreciation for anything that he has given her and has not replied to his Avritten invitation to visit him this summer at his home in Westerly. He questioned her ability to handle any sizeable amount of money herself and preferred the trust idea for that reason, and also for the tax saving effected by the remainder of the trust going to the Westerly Hospital. Mr. Thornton was given instructions by Mr. Lefferts to make up a tentative will to go over with Mr. Lefferts on Monday August 18 at 1:30 at my office. And at that time I gave to Mr. Thornton the one copy that I had of Mr. Lefferts’ 1956 will, Avhich Avas the thermofax copy of his will. The carbon copy was returned to Mr. Lefferts after we had made the thermofax of it.”
*601 Mr. Thornton’s description of this meeting was to the same effect. He added that he was told by Mr. Lefferts that ‘1 he wanted to get this taken care of promptly.” It was arranged that Thornton would draft the will and go over it with Lefferts the following Monday afternoon. Thornton prepared the will and discussed it with Ward at the latter’s office on Sunday, August 17. The contestant pictures this meeting, held in a closed bank on a Sunday, as something conspiratorial in nature, but the simple explanation is that Thornton was out of town all day Saturday and wanted to check the accuracy of his handwritten draft in preparation for the scheduled meeting with the testator on Monday. Thornton brought Ward a typewritten draft on Monday morning. When the time arrived for the meeting with Mr. Lefferts in the afternoon, the latter failed to appear. A telephone call revealed that Lefferts and Boyd were engaged in some sort of argument. Apparently this was concerned with a proposal made by Mr. Lefferts that Boyd be named as a legatee in the new will, a proposal which Boyd rejected because it might impair his pension rights. Mr. Lefferts then came to the telephone and the ensuing discussion between him and Ward is strongly emphasized by the contestant as an indication of mental incompetence. The decedent said he wanted more time to consider the bequests, especially to his 11 cousin” Miss Spencer; and he did not seem to understand, according to Ward, that the bequests to be made in the new will were not to be paid immediately, but at his death. The meeting was put off until the following day.
At 10 o’clock the following morning, August 19, the parties met at the bank. Thornton first went over the will with the testator, who said that everything was just as he wanted it and that he wished to execute it at once. Two ladies employed in the bank were called in to act as witnesses. Mr. Lefferts knew them both and greeted them in a friendly manner. The will was then executed, with the two ladies and Mr. Thornton acting as witnesses. Ward was present throughout this meeting. He had offered to withdraw while the decedent and Thornton were discussing the will, but Mr. Lefferts had asked him to remain. After its execution the original will was left at the bank and a copy was given to the testator. The two ladies withdrew. There followed a discussion as to what the procedure would be if the decedent wanted to remove his securities to New York after leaving Westerly in the Fall. That ended the meeting. On September 12, Mr. Lefferts stopped into Ward’s office, told him he "was leaving for New Rochelle and bade him good-bye.
*602 The foregoing is believed to be a fair summary of the evidence contained in a voluminous record. The first question to be answered is whether it indicates that Mr. Lefferts was not competent to make a will.
Advanced age is ordinarily accompanied by impairment of the physical or mental faculties, but the will of an elderly person is not for that reason to be rejected (Horn v. Pullman, 72 N. Y. 269). The question is always one of degree. If the testator had in mind the natural objects of his bounty, if he comprehended the nature and extent of his property, and if he understood the business being transacted and the document being executed, then he had the mental capacity to make a will (Matter of Heaton, 224 N. Y. 22; Matter of Burnham, 201 App. Div. 621, affd. 234 N. Y. 475, supra; Matter of Coddington, 281 App. Div. 143, affd. 307 N. Y. 181). The evidence must be evaluated in the light of these familiar tests.
It is perfectly clear in the record that Mr. Lefferts was never insensible of the fact that the individual closest to him after the death of his wife was his niece, the present contestant. She figured importantly in every one of his wills, and of course assumed increased stature in his eyes after the death of Mrs. Lefferts. It is quite plain also that in his late wills he was troubled by the problem of whether to leave virtually the whole of his large estate to his niece outright or to create a trust and limit her to the income. Thus in the 1955 will she was the residuary legatee. Eight months later we find the decedent instructing Mr. Franchot to change the residuary clause to a trust — and then changing his mind again with the remark that if his niece wanted to dissipate the inheritance that was her business. He adhered to that conclusion in the two wills made in 1956, but the problem had not been finally resolved to his satisfaction. During the Summer of 1957 he told his friend Boyd that he was worried about making his niece his sole heir because she knew nothing about finances. On a later occasion he told Boyd that he was going to disinherit the niece because he had asked her about her own finances and had been told it was none of his business. Of course, the threat to disinherit her was not carried out. The decedent had told Mr. Franchot at the time he made his previous will that ‘ ‘ we fight like cats and dogs at times * * * but it doesn’t mean that I don’t love her. ’ ’ The 1958 will had its origin on July 28 of that year when Mr. Lefferts walked into Ward’s office and told him that he intended to make a new will eliminating his niece entirely because she had ignored an invitation to visit him that Summer and had shown no appreciation of what he had done for her. Again the threat was not carried out, but *603 the interview culminated in the will of August 19,1958 in which the outright residuary gift was turned into a trust. The conclusion seems inescapable that at all times after his wife’s death the niece was uppermost in the decedent’s thoughts. The test in determining testamentary capacity is not whether the testator provided for the natural object of his bounty to the latter’s satisfaction, but simply whether he was aware of whatever claim she might have upon him as his next of kin.
The next test is whether the testator was aware of the nature and extent of his property. There is abundant evidence of such awareness. The proponent produced a book entitled ‘1 Investment Record ’ ’ in which Mr. Lefferts kept in his own handwriting a record of his investments and of the monthly income received from each. The entries commence in January, 1938 and end in July, 1959, thus including the Summer of 1958 in which the disputed will was made. He drew virtually all his own checks. He made the necessary entries in the checkbooks. He reconciled his own bank balances. In the weeks preceding the making of the will he was watching the stock quotations daily and discussing investments with Dr. Ruisi. There is nothing whatever in the disputed will or in the circumstances preceding its execution indicating that Mr. Lefferts had any misunderstanding of his holdings.
The remaining test of mental capacity, as indicated in the authorities already cited and in various others, is whether the decedent understood the business to be transacted and the document to be executed. In the time that elapsed between his first visit to Mr. Ward on July 28 and the execution of the will on August 19 there is little reason to doubt that he understood quite clearly what he was about. He was determined to accomplish two things with respect to his will. The first was the substitution of the Washington Trust Company for the Industrial Bank as fiduciary. Mr. Lefferts was evidently a man who was easily irritated and inclined to act impulsively when offended. He had become displeased with Industrial because of some difficulty, real or fancied, in removing his securities from the box in that bank. Whether there was adequate reason for his displeasure is beside the point. The contestant’s claim that the difficulty was due only to the fact that he had forgotten his key is not satisfactorily established by the evidence. Perhaps the fault was his own, but it is neither necessary nor reasonable to conclude that in abandoning one bank for the other he had taken leave of his senses. He had done exactly the reverse, and for no greater reason, when in 1956 he substituted Industrial for the Washington Trust Company; and in 1956 he was admittedly competent. *604 His other object was to change the residuary provisions of the will in some manner. There was nothing unreasonable or even novel in the change he finally made, as has already been demonstrated.
The decedent’s excitable character adequately explains what occurred on August 18. He was irritated by occurrences which to others may seem trifling. He had quarrelled with one bank, and then with the other. He quarrelled continually with his niece • — ■ they fought, as he told Mr. Franchot, 1 ‘ like cats and dogs.” On the day before the execution of the 1958 will he quarrelled with his friend Boyd. The cause appears to have been that he had proposed a $5,000 legacy for Boyd, and the latter insisted he wanted no legacy. In the midst of the quarrel Ward telephoned. In a state of excitement the decedent spoke of Miss Spencer as his cousin, and seemed confused about whether the legacies were to be paid at once or upon his death. Whether these remarks indicated a mental aberration may be debatable. But we are concerned with the man’s state of mind on the day when the will was executed. The will correctly described Miss Spencer as a friend of his wife and himself. It purported to effect no transfers except upon death. Mr. Lefferts went over the document with his lawyer and pronounced it exactly right. On that occasion there is no indication of any misunderstanding of what the will contained or of what sort of business was being transacted. On all the evidence the court concludes that on August 19, 1958 the decedent was competent to make a will. The second objection must therefore be dismissed.
There remains the question of fraud and undue influence. Much of what has already been said has a bearing on this issue. It is claimed that certain individuals and the bank itself induced the decedent to make this will contrary to his own inclinations, and that they succeeded in doing so because they were dealing with a man of weakened will and impaired understanding. On the contrary, the evidence indicates that Mr. Lefferts was a strong-minded and determined individual.
The persons charged with fraud receive not a penny under tin's will, and the question naturally arises as to what motive they could have had for engaging in such a discreditable enterprise as is pictured by the contestant. The accusing finger is pointed mainly at Ward. His motive is said to have been an overpowering desire to bring a large estate into the trust department of a small bank; as a result of which the bank would get the commissions, and Ward would get the credit. The lawyer, Mr. Thornton, is charged with being one of the con *605 spirators. The motive ascribed to him is far from clear, though perhaps we are asked to infer that he was prepared to sacrifice his client in order to curry favor with a local banking institution. The only tangible reward he received was a fee of $75 from the decedent. Another of those accused by the contestant is James W. McCormick, a director of both the Washington Trust Company and the Westerly Hospital. He was also a large stockholder in the Industrial Bank, however, so that his motive for joining the supposed plot is completely obscure. The fact is that McCormick had nothing to do with the will except that on one occasion Ward discussed it with him on the telephone. Boyd is similarly accused, but no reason for wrongdoing on his part has even been suggested. Here is a man who absolutely refused to be included in the will as a legatee and now finds himself charged with engaging in a conspiracy for the sole benefit of others. Even Dr. Ruisi is accused, not of any wrongdoing in connection with the will, but of giving false testimony to establish the decedent’s mental capacity. And his motive? It is said to be the fact that he is on the medical staff of the Westerly Hospital. The contestant’s reasoning is not persuasive. The court simply cannot believe that these men engaged in a sinister design to defraud an elderly neighbor, and to uphold a fraudulent will, for rewards so slight and purposes so nebulous.
Apart from the question of motive, the evidence does not sustain the claim that the will was imposed upon the decedent by Ward or anyone else. Mr. Lefferts himself was the moving force behind the making of the new will. He initiated it by coming to Ward and announcing his purpose to revise the previous will. He told Ward of the changes he proposed to make. He was responsible for the later meetings. He told Thornton he wanted the matter taken care of promptly. Ward appears to have defended the interests of Miss Lefferts as far as he could do so. He argued against the decedent’s original determination to exclude his niece from the will by refusing to believe that Mr. Lefferts really wanted to disinherit his only relative. When the tax benefits of a residuary trust attracted the decedent’s attention, Ward attempted to get him interested in a plan to place only one half of the residue in trust, leaving the other half to his niece outright. The court finds nothing-improper in the process by which Thornton was selected as the attorney. Nothing was misrepresented to the decedent. No one attempted to change him in his own declared purposes, except to soften the blow to Miss Lefferts by keeping her in the will as a major donee.
*606 The burden of proving fraud and undue influence is on the contestant (Matter of Kindberg, 207 N. Y. 220; Matter of Anna, 248 N. Y. 421). The influence necessary to invalidate a will must amount to coercion and duress (Matter of Schillinger, 258 N. Y. 186). Although the subversion may be established circumstantially {Bollwagen v. Bolhvagen, 63 N. Y. 504, 519), the proof must lead justly to the inference that the will did not express the real wishes of the testator (Matter of Fleischmann, 176 App. Div. 785). The contestant has not borne the burden. She has failed to establish any coercion which could lead to the inference of a will obtained in disregard of the testator’s wishes. The third objection must therefore be dismissed.
The court finds that the propounded instrument was executed in accordance with the requirements of the laws of the State of Rhode Island and of section 21 of the Decedent Estate Law of New York; that at the time of its execution the testator was in all respects competent to make a will and was not under restraint. The objections are therefore dismissed and the instrument will be admitted to probate as a will valid to pass real or personal property.